**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | |
|---|---|
| Raymond Cross;<br>Marilyn Hudson<br><br>    *Plaintiffs*,<br><br>v.<br><br>Mark Fox, individually and as a<br>member of the Three Affiliated<br>Tribes Tribal Business Council;<br>Randy Phelan, individually and<br>as a member of the Three<br>Affiliated Tribes Tribal Business<br>Council; Fred Fox, individually<br>and as a member of the Three<br>Affiliated Tribes Tribal Business<br>Council; Mervin Packineau,<br>individually and as a member of<br>the Three Affiliated Tribes Tribal<br>Business Council; Judy Brugh,<br>individually and as a member of<br>the Three Affiliated Tribes Tribal<br>Business Council; Cory Spotted<br>Bear, individually and as a<br>member of the Three Affiliated<br>Tribes Tribal Business Council;<br>Monica Mayer, individually and<br>as a member of the Three<br>Affiliated Tribes Tribal Business<br>Council<br><br>    *Defendants*. | )<br>)<br>)<br>)<br>) CASE NO._____<br>)<br>)<br>)<br>)<br>)    **COMPLAINT**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

   1.  Plaintiffs Raymond Cross and Marilyn Hudson, by and through their

undersigned counsel, respectfully submit this Complaint seeking a declaratory judgment

and injunctive relief against the Tribal Business Council of the Three Affiliated Tribes

("TAT") and the members of the Tribal Business Council, individually (hereinafter, collectively, "Defendant TBC"), and state as follows:

## I.   INTRODUCTORY STATEMENT

2.     Defendant TBC established in 1956 and 1986    voting and/or representational practices, standards or procedures in violation of § 2 of the VRA that have continued to **a.** deny Plaintiff Cross' undisputed right to vote—as well as those of his fellow qualified, non-resident TAT voters—in all TAT elections by impermissibly burdening his exercise of that right via its imposition of its 1986 "return to the Reservation to vote" requirement in all TAT elections and **b.** dilute, by its 1956 action, Cross' political participatory and representational rights by totally and permanently excluding him—as well as his  fellow qualified, non-resident TAT voters who now constitute between 75%-80% of the enrolled TAT membership—from ever **holding** (emphasis added) any political office within the TAT, ever **nominating** (emphasis added) any political candidate of their choice and ever securing **representation** (emphasis added) on the TAT's governing body.

### A.     Vote Denial Under Defendant TBC's 1986 Action

3.     Defendant TBC has **denied** (emphasis added) Plaintiff Cross' undisputed and fundamental right to vote—as well as those equally undisputed voting rights of his fellow non-resident TAT voters—in all TAT elections by:

a.     requiring them to "return to the Reservation to vote" in all TAT elections regardless of their personal circumstances—such as their advanced age, their severe physical disability, their poverty, their military service obligations, their college or trade school attendance, their employment duties or their parental and/or elder care

responsibilities—that make it practically impossible for them to comply with the Defendant TBC imposed and presently enforced requirement. For example, Plaintiff Cross suffers from a medically documented extreme physical disability that makes it virtually impossible for him to travel. Nevertheless, he **must** (emphasis added), by virtue of this 1986 Defendant TBC's order, return to the Reservation in order to vote in both the primary and general 2020 TAT elections, despite the fact that he resides over 1500 miles, one way, from the Reservation in Tucson, Arizona, and despite the fact that he must have a companion or assistant (usually his wife) travel with him so as to meet his medical and other personal needs during his travels. *See* TAT Election Ordinance, Chapter 1, Section 3(B) ("Each qualified voter, who is not a legal resident of the Fort Berthold Reservation on the date of an election . . . shall return to the reservation in order to vote in the election.");

b.      denying Plaintiff Cross, along with his fellow non-resident TAT voters, access to Defendant TBC's contemporaneously legislated literal raft-load of easy to obtain regulatory exemptions—known as absentee ballots—that relieved the holder thereof from having to physically appear at his or her assigned Reservation polling site on TAT election day. But these regulatory exemptions are available to only **resident** (emphasis added) TAT voters. *See* TAT Election Ordinance, Chapter VI, Section 1(A)(1)(a)(e)[1]. Regardless, Plaintiff Cross applied to the TBC Election Board in late

---

[1] Chapter VI, Section 1(A)(1)(a)-(e), Procedures for Resident Voting by Absentee Ballot, TAT Election Ordinance provides as follows:

> A qualified voter, who is a legal resident of the Fort Berthold Reservation . . . may register to vote and cast his/her ballot in accordance with the procedure prescribed in this Chapter, only if one of the following conditions is satisfied . . . . He/she will be absent from the Reservation on the date on which the election is to be held  . . . for only the following acceptable conditions:

Spring, 2018, for an absentee ballot that would have enabled him to vote in the pending TAT elections of that year. His application for that absentee ballot was based on his "extreme physical disability"—an expressly recognized basis for obtaining such a ballot by Section 1(A)(1)(d) of the TBC Election Ordinance. However, that Board summarily and arbitrarily denied Cross' request—without any due assessment on its part of his proffered medical proof of his qualifying condition—with a curt written explanation that because he resided off Reservation he was ineligible for an absentee ballot. *See* King Aff.[2] Exhibit A (Election Board rejection letter); and

      c.     Plaintiffs Cross and Hudson respectfully submit that Defendant TBC's regulatory constructed and unstintingly enforced voting requirements constitute proscribed standards, practices or procedures within the meaning of § 2 of the VRA that unfairly and substantially burden their fundamental and undisputed rights to vote, as well as those rights of Cross' fellow non-resident TAT voters, to such an extent as to deny them, both facially and as applied, the equal protection and due process of law.

**B.    Vote Dilution Under Defendant TBC's 1956 Action**

    4.     Defendant TBC—pursuant to its installation of the 1956 segment-based system of political representation within the TAT—has permanently and totally excluded

---

a.    Absence due to duly scheduled work related travel;
b.    Hospitalization;
c.    Attending School where he/she is unable to travel to the Reservation of the day of the election;
d.    Extreme physical disability where traveling is physically impossible (proof shall be required); or
e.    Service in the United States Armed Forces

[2] All exhibits and supporting materials are attached to the Affidavit of Lawrence E. King ("King Aff."), filed herewith.

Plaintiff Cross, along with his fellow non-resident TAT voters who now comprise between 75%-80% of the enrolled TAT membership of some 16,700 individuals, from ever holding **any** (emphasis added) TAT office, nominating **any** (emphasis added) political candidate that reflects his interests or viewpoint and or ever securing **any** (emphasis added) representation whatsoever of his unique political and economic interests on the TBC. *See* TAT Constitution, Article III, Governing Body, Sections 1-6 (As amended by Amendment No.1, effective October 16, 1956).

5.    The 1956 TBC effectuated its newly imposed political representational system on Fort Berthold Reservation via its October 16, 1956 sponsored constitutional amendment—that was neither explained to, nor debated by, the affected TAT membership as a whole—that practically established a "tribe within a tribe." This TBC decision introduced two hitherto unknown legal and political concepts within the TAT: (1) **segment-based representation** (emphasis added); and (2) **class-based representational rights** (emphasis added).

6.    Its first new principle of TAT governance—segment-based representation— locked all future TAT political and economic authority into those six (6) Reservation land parcels that remained after the wrack and ruin that was inflicted on the TAT people by the Garrison Dam and by the inundation of their Reservation under trillions of gallons of waters that were impounded by the 110 mile long flood control reservoir known as Lake Sakakawea. Its second new principle of TAT governance—class-based TAT representational rights—established two new starkly and distinctively different, but now wholly unequal, classes of TAT membership to replace the hitherto wholly equal and undifferentiated TAT membership: (1) a class of **resident** (emphasis added) TAT

5

members who—by virtue of the 1956 TBC decision—would have full representational rights that expressly assured them of permanent political and economic dominance on the TAT's governing body; and (2) a class of **non-resident** (emphasis added) TAT members—who by virtue of the 1956 TBC decision—would have absolutely no representational rights within the TAT. Plaintiff Cross—along with his fellow qualified, non-residents TAT voters—are members of class "(2)".

  7. DOI Secretary D'Ewart's[3] 1956 TAT Indian Termination plan for the Fort Berthold Reservation provides the relevant and necessary "totality of the circumstances" context for understanding Defendant TBC's 1986 and 1956 actions that have resulted in Plaintiff Cross' vote denial and vote dilution claims under § 2 of the VRA today. D'Ewart sought to achieve his Indian termination goals and objectives that were imposed upon him and the DOI by the 1953 House Concurrent Resolution (HCR) 108 (Federal Indian Termination Law) via his assertion of administrative financial influence over the TAT governing body from 1951 onward until 1956. He did so in a clear cut attempt to significantly reduce the number of TAT members who would continue—after the federal government's inundation of their Reservation—to reside on the Reservation and for whom

---

[3] D'Ewart, Wesley Abner, a Representative from Montana; born in Worcester, Mass., October 1, 1889; attended the public schools of Worcester, Mass., and Washington State College at Pullman; moved to Wilsall, Park County, Mont., in 1910 and engaged in the Forest Service; stockman, farmer, and businessman in Park County, Mont.; served in the State house of representatives 1937-1939; member of the State senate 1941-1945; elected as a Republican to the Seventy-ninth Congress, by special election, June 5, 1945, to fill the vacancy caused by the death of James F. O'Connor; reelected to the four succeeding Congresses and served from June 5, 1945, to January 3, 1955; was not a candidate for renomination in 1954, but was unsuccessful for election to the United States Senate; assistant to the Secretary of Agriculture, Washington, D.C., from January 1955 to September 1955; assistant secretary, Department of the Interior, from October 1955 to July 1956; special representative to Secretary of Agriculture from August 1956 to October 1958; unsuccessful candidate for the Republican nomination for Governor of Montana in 1960; member, Western States Water Council, 1966-1969; was a director of the National Water Resources Association; resided in Wilsall, Mont.; died in Livingston, Mont., September 2, 1973; interment in Mountain View Cemetery.

the federal government would continue to be responsible for under its judicially imposed

Indian wardship duties. The following is a brief excerpt from a 1960 law review article by

the long-time and former Solicitor of the Interior Department, Felix S. Cohen:

> An unpublished study by the Bureau of Ethnic Affairs, of which former [Indian] Commissioner John Collier is President, has already described [the then Indian] Commissioner Myer's [Indian] 'withdrawal' [later formalized in 1953 into DOI's Indian Termination and Urban Indian Relocation programs by Congress' enactment House Concurrent Resolution (HCR) 108] for the [DOI sponsored TAT Termination or] programs for the Indians as 'similar to the authoritarian, racist and stereotyped administration that he directed for the Japanese-Americans in WWII.' In both situations, Commissioner Myer embarked up a [Indian] relocation 'emphasizing resettlement to the exclusion of other considerations and…discouraging directly or indirectly all efforts at community building on the grounds that such would…operate against resettlement.' Ibid. In both situations, an administrator [herein the DOI] has thought he [Secretary D'Ewart] has thought he knows best where other American citizens should live and what they should do and has arranged that the entire force of the government will operate to make the [TAT] people to do what he deems is in their best interests.' Commissioner Myer thus seems intent upon repeating, [on the Fort Berthold Reservation among others], what has aptly been described as 'Our Worst Wartime Mistake'. [quoting Rostow, *Our Worst Wartime Mistake*, 191 Harper Magazine 193 (1945)].

*See* Felix S. Cohen, *The Erosion of Indian Rights, 1950-1953: A Case Study In*

*Bureaucracy,* 62 Yale Law Journal 348, 390 (1960).

8.    This bargained for exchange between the 1956 TBC and Secretary D'Ewart

came to an end in 1956 as is reflected in a 1956 Senate Report regarding the culmination

of this long struggle between the TAT people who ferociously resisted the federal

government's effort to unilaterally terminate their federally recognized status, on the one

hand, and Secretary D'Ewart's insistence that the DOI would not grant the TAT people

"per cap" access to their $7.5 million in DOI embargoed Congressionally awarded treaty

breach damages for the 1949 Garrison Taking, on the other hand, until and unless the

1956 TBC agreed to the fundamental restructuring of TAT legal and political life on the Reservation so as to facilitate the DOI's goal of radically de-populating that Reservation by effectively expelling its youngest, best educated and most vital members by sending them to assertedly new lives and jobs in America's newly burgeoning industrial centers via the BIA's Urban Indian Relocation Program that dated from the mid-1950s to the late 1960s. Here's the relevant portion of the referenced Senate Report that documents Secretary D'Ewart's central role in this process (his name and signature appears on every transmittal letter or other documents that were exchanged between the committee of jurisdiction and the DOI in this process):

> Following the abandonment of the 1951 program and the refusal of the Department [of the Interior] to make per capita distribution of all of the funds, many discussions were held on the drafts of proposed bills which, over a period of years, would give the members of the [TAT] tribe control over the remaining [majority of] funds and would **terminate** [emphasis added] Federal trusteeship and supervision over their affairs. Complete agreement was not reached on any of these proposed bills, and none was submitted to Congress by the Department.

*Providing For The Segregation Certain Funds Of The Fort Berthold Indians On The Basis Of A Membership Roll For Such Purpose*, S. Report 84-2, Accompanying S.B. 1251, March 9, 1956.

9.     Plaintiffs Cross and Hudson respectfully submit Defendant TBC's 1956 action established standards, practices, or procedures that deny Plaintiff Cross' right of political representation, and therefore, violate § 2 of the VRA and also deprive him of the equal protection and due process of the law.

## II.     JURISDICTION AND VENUE

10.    This is an action for a declaratory judgment under 28 U.S.C. §§ 2201, *et seq*. and injunctive relief under Fed. R. Civ. P. 65.

11.    This Court has subject matter jurisdiction over Plaintiffs' claims for relief herein because the claims "arise under" the laws, treaties, decisional law, and Constitution of the United States.   *See American Well Works v. Layne*, 241 U.S. 257 (1916) (A "suit arises under the law that creates the cause of action.").   More specifically, Plaintiffs' lawsuit arises under the Fifth, Fourteenth, Fifteenth Amendments to the United States Constitution; sections 2 and 3 of the 1965 Voting Rights Act ("VRA"), 52 U.S.C. § 10301, formerly 42 U.S.C. § 1973; the "jurisdiction and exhaustion of other remedies" provisions of the VRA, 52 U.S.C. § 10101(d); the due process and equal protection provisions of the Indian Civil Rights Act of 1968 ("ICRA"), 25 U.S.C. §§ 1301-1304; Section 16 of the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 5123, formerly 25 U.S.C. § 476;  the TAT's Agreement of 1886 establishing the Fort Berthold Reservation and the TAT's governmental/jurisdictional authority thereover (Act of March 3, 1891, ch. 543, section 23, Article V, 26 Stat. 989, 1032 (1891)); the 1937 Corporate Charter of the TAT establishing a federal corporation chartered under the Act of June 18, 1934 (Section A(3)  of the Corporate Charter provides "[TAT] shall be a membership corporation . . . [i]ts members shall consist of all persons now or hereafter members of the [TAT]." ).

12.    Venue is proper in the District of North Dakota pursuant to 28 U.S.C. § 1391 because Plaintiff Marilyn Hudson resides in this judicial district and because most, if not all, of the relevant events giving rise to this action occurred in this judicial district.

III.    **Plaintiffs' Fulfillment of Their Prudential and Legal Obligations Under the *National Farmers Union* Standard (Tribal Exhaustion)**

13.     Plaintiffs have chosen to bring a *de novo* action in this Court pursuant to their claims of vote denial and vote dilution by Defendant TBC in violation of § 2 of the 1965 Voting Rights Act ("VRA"), as amended.  The VRA provides "[t]he district courts of the United States shall have jurisdiction of proceedings instituted pursuant to [the VRA] and shall exercise the same without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law."  52 U.S.C. § 10101(d). Given that Plaintiffs' federal statutorily based claims, therefore, lie outside the jurisdictional competence of the Fort Berthold District Court as a tribal court, it makes little practical or legal sense for them to effectively split their case by pursuing what they regard as an illusory remand remedy in tribal court. Plaintiffs, with all due respect to the tribal court, firmly believe that the tribal court—at both the trial and appellate stages of Plaintiffs' case therein—greeted their assertions of their equal protection and due process rights that are guaranteed to them by both the express terms of the TAT Constitution, as well as by the specifically applicable federal statute known as ICRA, with seeming skepticism. For that reason, Plaintiffs assert and maintain that the tribal court demonstrably represents an inadequate judicial forum in which Plaintiffs should not be required to further litigate their rights.

14.     Plaintiffs have the right, as the U.S. Supreme Court acknowledges they do, to have their federal statutory and constitutionally based claims heard in an adequate judicial forum.  *National Farmers Union*, 471 U.S. at FN 21 (exhaustion is not required when Tribal Court does not provide an adequate judicial forum.) In this regard, the referenced MHA Supreme Court Order asserts that "it is **not** required to follow the same legal analysis [as would a federal court] applicable to rights afforded under the U.S.

Constitution."  King Aff. Exhibit B at lines 233-4. (MHA Supreme Court Order dated July 28, 2020).  Indeed, the Order goes on to baldly assert, contrary to the well-established and accepted law that governs all federal district courts, that it is "**not** required to treat [Plaintiffs'] right to vote as a fundamental right under tribal law."  *Id.* at line 239.

15.    Unfortunately, the MHA Court emphasizes in its decision that it's **not** bound by any cognizable federal or state constitutions, laws and/or decisions regarding Plaintiffs' voting rights—except, insofar as the Court **may** "discretion[arily] [choose to] classify [Plaintiffs'] voting rights . . . as fundamental."  *Id.* at line 240-1.  Given that the Tribal Court's governing theory seems to be that it is totally free and legally unfettered to decide Plaintiffs' voting rights upon whatever legal standard it may choose momentarily to apply to the TBC's undisputed actions that directly imperil Plaintiffs' rights—whether it by strict scrutiny, intermediate scrutiny, rational basis, or no legal scrutiny at all—the Tribal Court doesn't provide Plaintiffs with an adequate judicial forum in which to vindicate their voting rights claims.  Accordingly, Plaintiffs have fulfilled their prudential and legal obligations under the *National Farmers Union* standard.

## IV.    PARTIES

16.    Plaintiff Raymond Cross is a resident of Tucson, Arizona.  He is a seventy-two-year-old *Professor Emeritus of Law* at the University of Montana School of Law and he is also a 1973 Yale Law School Graduate.  He is presently an inactive member of the California and Colorado bars.

17.    Plaintiff Marilyn Hudson is a resident of Parshall, North Dakota.  She is over eighty years old and is a celebrated and well-known TAT historian and archivist who was the long-serving Director of the TAT Historical Museum in New Town, North Dakota.  She

is also the mother, grandmother, and great-grandmother to numerous TAT members who currently live and work off the Fort Berthold Reservation.

18.     Defendant TBC is the governing body of the TAT.  The TBC was created by the TAT people in 1936 through their compliance, as a reorganized Indian Tribe, with Sections 16 and 17 of the IRA of 1934 so as to become (1) a constitutional democracy that operates pursuant to its federally approved TAT Constitution of 1936; and (2) a membership based (including Plaintiffs Cross and Hudson as "equal shareholders" therein), federally chartered, for profit business corporation that operates pursuant to its 1937 federally issued and approved Charter of Incorporation whereby the TBC serves, at the TAT people's pleasure, as the managers of that corporation's tribally owned monies and assets.   Defendant TBC is subject to the equal protection and due process protections imposed by Section 8 of the ICRA, 25 U.S.C. §§ 1301 *et seq*.   See TAT Constitution, Article VI, Section (3)(b) (The Courts have "authority to enforce the provisions of the Indian Civil Rights Act . . . against the Tribal Business Council.").

## V.  PROCEDURAL HISTORY

19.     Plaintiffs faithfully worked on this case for nearly 2 years in the tribal court system.  On November 2, 2018, Plaintiffs commenced an action in MHA District Court, Case No. 2018-0530, seeking (1) a preliminary injunction requiring absentee ballots be sent to all tribal voters over the age of eighteen in the 2018 tribal elections and enjoining any further action on the "return to the Reservation to vote" requirement and (2) a declaratory judgment invalidating the "return to the Reservation to vote" requirement.  The issues in Plaintiffs' voting rights action were substantially briefed and thoroughly argued. On November 5, 2018, Tribal Court Judge Terry Pechota denied Plaintiffs' request for

preliminary injunction.   On March 8, 2020, Defendant TBC moved to dismiss Plaintiffs' Complaint and attached to its opposition a number of documents.   Based on the documents attached, the Court converted the motion to dismiss into a motion for summary judgment.   Plaintiffs responded to the motion to dismiss that had been converted into a motion for summary judgment and TBC replied. On May 30, 2019, the Tribal Court heard oral argument at the Fort Berthold District Courthouse in New Town, North Dakota. On August 5, 2019, Judge Pechota issued his Opinion and Order dismissing Plaintiffs' case. On October 24, 2019, Plaintiffs appealed the MHA District Court decision to the MHA Supreme Court and requested an expedited oral argument.   On April 20, 2020, Plaintiffs renewed their request for oral argument to the MHA Supreme Court in light of the advent of the COVID-19 pandemic. On June 3, 2020, the MHA Supreme Court heard oral argument via Zoom video call. on July 28, 2020, the MHA Supreme Court rendered its Opinion.

## VI.    STATEMENT OF FACTS

**A.    Facts Related to Plaintiffs Cross and Hudson**

20.    Plaintiffs Cross and Hudson are enrolled members of the TAT.

21.    Plaintiff Cross is a seventy-two-year-old male who presently resides off the Reservation in Tucson, Arizona.   In 2015, Cross was diagnosed by the Mayo Clinic in Rochester, Minnesota with a malignant spinal tumor that is located at the T-6 vertebrae of his spine. *See* King Aff. Exhibit C (Affidavit of Raymond Cross).   He is severely limited in his mobility and has little or no feeling in his lower extremities including his legs and feet. *Id.* He is presently under the care of his oncologist and several other related medical specialists at the Mayo Clinic.

22.     Plaintiff Hudson is an eighty plus year old female who presently resides on the Reservation in Parshall, North Dakota.  As an elderly woman, Hudson suffers from several diagnosed ailments.

**B.     Facts Related to the Contemporary State of the Fort Berthold Reservation**

23.     The TAT is a federally recognized Indian tribe that resides on the approximately one million acre (it is 988,000 acres in size, of which 457,837 acres are held in individually allotted or tribally owned trust status and the balance of that acreage is owned by non-Indians in fee status title) federally established Fort Berthold Reservation.  *See* Agreement between the TAT and the United States dated December 14, 1886, ratified March 3, 1891, 26 Stat. 1032.

24.     The federal government's decision to build one of the world's largest rolled-earth dams on the Reservation in the early 1950's—as part of its massive, multipurpose, water resources development program known popularly as the Pick-Sloan Program for the development of the Upper Missouri Basin or Garrison Taking—(a) flooded and physically took over 156,035 acres of the TAT's best and last remaining agricultural lands along the Missouri River; (b) destroyed nine (9) historic river bottom sited tribal communities, including Elbowoods and Independence, and geographically fragmented the Reservation into six (6) discrete and discontinuous segments;  and (c) occasioned the exodus from the Reservation of the TAT's younger, most productive, educated, and job ready men and women who left to seek new lives and job opportunities in America's urban job centers such as the Bay Area, Phoenix, L.A., Chicago, and Denver under the BIA's touted Indian Relocation Program of the later 1950s and 1960s that intentionally sought

14

to depopulate the Fort Berthold Reservation—as well as many other Reservations around the country—as part of the federal government's tribal termination program.

25.     Furthermore, many of those remaining Reservation residents—given the recent influx of mineral royalty payments from the Bakken oil and gas development beginning in 2008 to many TAT allotted mineral owners—have chosen to move off Reservation and into the surrounding towns and cities such as Bismarck, Minot, and Fargo, ND, in order to access more of life's amenities as well as better available health care.  However, many of those TAT members also choose to maintain post offices boxes and/or traditional family addresses on the Reservation.   Those who have chosen to maintain post offices boxes or addresses on Reservation are able to take advantage of the absentee balloting opportunities available for "resident" TAT voters.  Those who have not maintained post office boxes or addresses do not have the same absentee balloting opportunities.

## C.     Facts Related to Non-Resident Absentee Balloting prior to 1986

26.     Assistant Secretary of the Interior Wesley D'Ewart, on July 23, 1956, requested the TBC to authorize—by appropriate resolution—that all non-resident, qualified TAT voters have the acknowledged right to vote in all TAT elections from the date of that duly enacted resolution. D'Ewart requested the 1956 TBC to take this action to facilitate the exodus from the Reservation of hundreds of the youngest, best educated and most vigorous of the TAT via the auspices of the BIA's newly minted Urban Indian Relocation Program.  This exodus of TAT members was also a direct result of the massive dislocation and disemployment of the younger TAT members that was caused by the construction of the Garrison Dam and 110 mile long reservoir—that later became known

as Lake Sakakawea—on the Fort Berthold Reservation.    Secretary D'Ewart likewise compelled the 1956 TBC to grant any  eligible TAT voter who accepted the DOI's offer of relocation—so as to become a non-resident of the Reservation consistent with that federal agency's interpretation of the goals and objectives of HCR 108 (federal Indian termination law)—the TBC conferred right to vote in any future TAT elections by mail-in absentee ballot. *See* King Aff. Exhibit D (July 23, 1956 Letter of Assistant Secretary of Interior Wesley A. D'Ewart).

**D.    Facts Related to the TBC's 1986 "Return to the Reservation to Vote" Requirement**

27.    The Minot Daily News reported, during the late 1970s and early 1980s, on a brutal struggle for political power on the Fort Berthold Reservation as among various groups or factions. *See* Jack Graham and Jeff Nies, *Tribal Chairman's Foes Still Won't Accept Election*, Minot Daily News, June 23, 1979. In 1986, the TBC sponsored the "return to the Reservation to vote" requirement—via its convenient and preferential status to amend the TAT Constitution through an enactment of a Resolution that's approved by a 2/3 majority vote of the current members of the Council under the federal regulations that govern the tribal constitution amendment process—so as to end the existing rights of non-resident TAT voters to vote by absentee ballot.  This TBC sponsored action was taken without any due notice to the affected non-resident TAT voters who, even in 1986 made up over 70% of the TAT voting population.  This amendment to the TAT Constitution ended the pre-existing thirty (30) year old historical right and practice that had authorized non-resident TAT voters to cast absentee, mail-in ballots in any and all TAT elections on

the Reservation and replaced it with a requirement that **all** qualified TAT voters **must** "return to the Reservation to vote" in any future TAT elections:

> For the purposes of voting in [TAT] Tribal Council elections exclusively, any eligible voter of the Three Affiliated Tribes, whose place of legal residence is located outside of the exterior boundaries of the Fort Berthold Reservation on the date of an election, **shall return to the Reservation in order to vote in the election** and shall register to vote and cast his ballot at the appropriate segment polling place on the date of the election.

Article IV, Section 2(b), TAT Constitution (emphasis added).

28.     In implementing the constitutional provision, the TBC legislated through its TAT Elections Code a strict requirement—one admitting of no exceptions regardless of the actual physical, economic, employment, or military status of the affected non-resident TAT voters—demanding that "**each** qualified [TAT] voter, who is not a legal resident of the Fort Berthold Reservation, **shall return to the reservation in order to vote in [any and all TAT] election[s]**."  Chapter I, Section 3(B), Nonresident Voters, TAT Election Ordinance.

29.     Furthermore, the TBC—in that same Elections Code—legislated a series of five (5) readily and easily obtained regulatory exemptions that relieve **resident**, but not **non-resident**, TAT voters from having to appear in person at the established TBC polling sites to vote in any and all TAT elections.[4]

---

[4] Chapter VI, Section 1(A)(1)(a)-(e), Procedures for Resident Voting by Absentee Ballot, TAT Election Ordinance provides as follows:

> A qualified voter, who is a legal resident of the Fort Berthold Reservation . . . may register to vote and cast his/her ballot in accordance with the procedure prescribed in this Chapter, only if one of the following conditions is satisfied . . . . He/she will be absent from the Reservation on the date on which the election is to be held  . . . for only the following acceptable conditions:
> a.     Absence due to duly scheduled work related travel;
> b.     Hospitalization;

17

30.     Accordingly, the "return to the Reservation to vote" requirement as implemented by the TBC requires **only** Cross and his fellow non-resident TAT voters to physically appear at the TBC established polling sites in order to cast a valid ballot in tribal elections, given that resident TAT voters can be, and are, easily exempted by the TBC's Election Board ("TEB") from this physical appearance requirement based on their mere assertion or allegation to the TEB that they will be absent from the Reservation on election day.  Indeed, Cross, during the 2018 TAT elections, applied to the TEB for an absentee ballot due to his extreme and demonstrable physical disability that would make automobile and/or air travel from Tucson, AZ to the Reservation, roundtrip, very difficult and expensive.   But the TEB summarily denied his request without even pausing to examine his proffered medical proof of his disability. *See* King Aff. Exhibit A (Election Board rejection letter).  Likewise, Ms. Vanessa Price's request for an absentee ballot— based on extreme economic and social hardship—for the 2020 TAT elections submitted on April 27, 2020, has not even received the courtesy of an acknowledgement of its receipt.  *See* King Aff. Exhibit E (Letter of Vanessa Price).

**E.     Facts Relevant to Assistant Secretary D'Ewart's Establishment of the 1956 System of Political Governance on the Fort Berthold Reservation**

31.     In 1945, TAT life on the Fort Berthold Reservation was good: the younger men had returned from their service in WWII, agricultural production was growing, divorce was rare, most children lived in two parent households, all of the tribal children were

---

c.     Attending School where he/she is unable to travel to the Reservation of the day of the election;

d.     Extreme physical disability where traveling is physically impossible (proof shall be required); or

e.     Service in the United States Armed Forces

18

enrolled in school, and less than 3% of TAT members—mostly the elderly or disabled—depended on BIA or county welfare assistance. But soon everything about the lives of these tribal people, who had lived  for centuries on the remnants of their once vast aboriginal lands, would be utterly and completely destroyed by the construction of the Garrison Dam and that 110 mile long flood control reservoir, Lake Sakakawea, on their federal treaty established and protected Reservation.

32.     Though the TAT fought hard and valiantly in the late 1940s—particularly though their TAT Chairmen, Martin Cross and George Gillette, who made many trips to Washington, D.C. to speak to Congress to stop that injustice—against the forced taking of 156,035 acres of their last remaining and agriculturally valuable river bottomlands, they could not stop the Army Corps of Engineers from continuing to build the Garrison Dam on their Reservation.

33.     In 1953, the flood gates of the completed Garrison Dam were closed and the flood waters rose on the Reservation, thereby forcing many, if not most, of the younger, better educated and most vigorous of the TAT members—who were without any money or any job prospects on the now fundamentally shrunken Reservation—to accept the uncertain promise of a better life and future via the BIA's Urban Indian Relocation Program that took them into America's burgeoning job centers like the Bay Area, Denver, Phoenix or Chicago.

34.     But not only did the Dam's rising flood waters end the hopes and dreams of many young TAT members from ever living a Reservation based way of life, they also ended the TAT people's age-old system of inclusive and equal political governance and economic existence. Prior to the Dam virtually all the TAT's approximately 2400 enrolled

members had lived in 9 river bottom communities of which Elbowoods, Independence and Sanish were the most important.  Furthermore, the TAT people, the only Northern Great Plains tribe to accomplish this feat, lived a comfortable and economically independent way of life raising cattle and growing crops on their rich, sheltered bottomlands along the Missouri River.

35.    Unfortunately, the vast wrack and ruin inflicted on the TAT people by the Garrison Dam—on their pre-existing social, cultural, economically inclusive and most importantly, for our purposes, on their prior system of political governance—left them especially vulnerable to the federal governmental manipulation and influence of one man—Assistant Secretary Wesley D'Ewart—who was sent to Fort Berthold during the tribal relocation period in 1955 by the Department of the Interior (DOI) to persuade the TAT people and its TBC the ultimate federal termination of the TAT people's status as a federally recognized Indian tribe.

36.    As  was articulated in DOI's "marching orders" on Indian termination embodied in Congress' 1953 House Concurrent Resolution (HCR) 108, D'Ewart's task was to implement the process of termination on Fort Berthold in discrete steps:   a. Depopulate the Fort Berthold Indian Reservation; b. Restructure the political governance system on Fort Berthold so as to restrict future TAT political and economic benefits to an expectedly significantly fewer reservation residents while intentionally excluding therefrom,  those (expectedly) many more off-reservation TAT members who were to be intentionally created by the application of Secretary  D'Ewart's termination policies on Fort Berthold; and c. Encourage North Dakota to take advantage of the federal jurisdictional transfer provisions of a 1953 federal statute known as P. L. 280  whereby that state would

20

replace the federal government as the primary criminal law overseer of all of those tribal Indians who resided within Indian Country—including the Fort Berthold Reservation—that was located within that state.

37.     Secretary D'Ewart wielded extraordinary influence over the lives and futures of the TAT members in the mid-1950s: total control over their only remaining financial life line represented by the $7.5 million damage award that Congress had ordered paid directly to the TAT people for the taking of their treaty protected Reservation.

38.     But Secretary D'Ewart consciously and intentionally refused to give the TAT people access to their own monies until they agreed to accept termination of their status as a federally recognized Indian tribe which they steadfastly and adamantly refused to do. Here's an excerpt from a 1956 Congressional report regarding this continuing stalemate over termination on the Fort Berthold Reservation:

> Following the abandonment of the 1951 program and the refusal of the Department [of the Interior] to make per capita distribution of all of the funds, many discussions were held on the drafts of proposed bills which, over a period of years, would give the members of the [TAT] tribe control over the remaining [majority of the] funds and would **terminate** [emphasis added] Federal trusteeship and supervision over their affairs. Complete agreement was not reached on any of these proposed bills, and none was submitted to Congress by the Department.

*Providing For The Segregation Certain Funds Of The Fort Berthold Indians On The Basis Of A Membership Roll For Such Purpose*, S. Report 84-2, Accompanying S.B. 1251, March 9, 1956.

39.     D'Ewart ultimately succeeded in his major Indian termination goals on Fort Berthold of depopulating the Reservation as much as possible and of persuading the 1956 TBC to fundamentally restructure the TAT representational and governance system.

His first goal was accomplished by his sending as many of the youngest, best educated and most vital TAT members as was possible to assertedly new jobs and lives in America's burgeoning industrial centers under the BIA's Urban Indian Relocation Program that flourished from the mid-1950s to the late 1960s. His second goal was accomplished by persuading the 1956 TBC—in exchange for his finally agreeing (on behalf of the DOI) to release DOI's long embargoed $7.5 million in Congressionally awarded treaty breach damages for the 1949 Garrison Taking for immediate "per capita" payments to each TAT member—to adopt a new system of TAT political governance known as segment-based political representation. In contrast to the TAT's prior inclusionary system of political governance—wherein no status distinction of any sort was drawn between presumptively co-equal TAT members—this new TAT representational system was designed to be highly exclusionary. It drew sharp and wholly new distinctions between the political and economic rights of **residents** (emphasis added), on the one hand, and **non-residents** (emphasis added), on the other hand.   The exclusionary character of the segment-based representational system is evident in the newly imposed (as of 1956) requirement that six out of the seven members of the TBC **must** (emphasis added) be elected from among the **residents** (emphasis added) of the six segments. *See* TAT Constitution, Article III, Governing Body, Section 2 ("[O]ne council member is [to be] elected from each of the segments, by a majority of the…votes cast for the office of Council representative from that respective segment.")  Likewise, Plaintiff Cross, and his fellow non-resident TAT members, are expressly deprived of competing for the one "at large" elected TAT office: TAT Chairman. *See* TAT Constitution, Article IV, Nominations,

Section 6 ("Any qualified [TAT] voter who is a bona fide **resident** (emphasis added) of [one of] the [six] segments...may become a candidate for Tribal Chairman.").

40.     Felix S. Cohen—the long-time Solicitor of the Interior Department and the sole author of the monumental legal work, *The Handbook of Federal Indian Law*, which single-handedly salvaged Indian law in its intended place in the dustbin of history—described Indian Commissioner Myers' "withdrawal" or termination program for Indians as similar to the "authoritarian, racist and stereotyped administration which he [Myers] directed for the Japanese-Americans in World War II." In both cases—Japanese-American relocation and Indian termination—Myers emphasized internee re-settlement in camps or Indian relocation off Reservation to the exclusion of all other considerations "including community building [on reservations] on the ground that such efforts would operate against [internee] resettlement or [Indian] relocation." *See* Felix S. Cohen, *The Erosion of Indian Rights, 1950-1953: A Case Study in Bureaucracy*, 62 Yale L.J 348 (1953). But in Myer's mind Indian termination meant that the "competent Indian would no longer be treated as half ward and half citizen..[i]t would mean reduced appropriations by the Government, and [it would] mean more self-respect and independence for the Indian [as well as his] ultimate absorption of the Indian race into the [American] body politic[.]"

**F.      Facts Related to the Present Day Corporate Organization of the TAT**

41.     Pursuant to the 1937 TAT Corporate Charter and the incorporation by reference of that Charter into the TAT Constitution, the TBC is the corporate manager and administrator of the TAT's tribal monies and assets. *See* TAT Constitution, Article VI, Section 5(a) ("The Tribal Business Council shall . . . manage all economic affairs and enterprises of the Three Affiliated Tribes of the Fort Berthold Reservation in accordance

with the terms of a charter to be issued to them by the Secretary of the Interior."). As corporate manager, the TBC is subject to all constitutional and federally imposed limitations on administering the TAT's monies and assets. *See* Exhibit F (TAT Corporate Charter, paragraph 5) ("The Tribe, subject to any restrictions contained in the Constitution and laws of the United states . . . shall have the following corporate powers."). Along with all other enrolled members of the TAT, Plaintiffs Cross and Hudson are "equal shareholders" in the TAT's monies and assets. *Id*. at paragraph 8.

**G.     Facts Related to TAT Voter Eligibility and the 2020 TAT Elections Schedule**

42.     TAT Constitution, Art. IV, Section 2(a):  "Any member of the Three Affiliated Tribes of the Fort Berthold Reservation, who is eighteen (18) years of age and over, shall be eligible to vote in any tribal election." (Amended by Amendment No. IV, effective on September 10, 1974).

43.     The 2020 TAT General Election is scheduled to be held on Tuesday November 3, 2020 to elect the following offices: (1) East Segment/White Shield Representative, (2) North Segment/Little Shell Representative, and (3) West Segment/Mandaree Segment Representative.   *See* King Aff. Exhibit G (2020 TAT Election Notice).

**H.     TAT's Voting Participation Rate Since Enactment of the "Return to the Reservation to Vote" Requirement**

44**.**     In the most recent TAT elections—the 2018 TAT Primary and General Elections on the Fort Berthold Reservation—approximately 2200 ballots were actually cast out of a potential 10,000 plus eligible TAT voting population—including both eligible

24

non-resident TAT voters and resident TAT voters—and the vast majority of ballots cast came from the resident TAT voting population on the Reservation.

45.    Based on information and belief, Plaintiffs assert that the disparate impact of the "return to the Reservation to vote" requirement falls primarily, if not exclusively, on non-resident TAT voters and this fact accounts for the low voting participation rate of non-resident TAT members as well as the extremely low TAT voter turn-out generally.

**I.    Facts Related to COVID-19's Presence in U.S., North Dakota, and Arizona**

46.    COVID-19 is defined medically as a mild to severe respiratory illness that is caused by a coronavirus (*Severe acute respiratory syndrome coronavirus 2* of the genus *Betacoronavirus*).

47.    As of August 26, 2020, the U.S. has had 5,967,010 COVID-19 cases resulting in 182,817 deaths.  *See Worldometer,* https://www.worldometers.info/cornaviru s/country/us/ (Last visited August 26, 2020).

48.    As of August 26, 2020, North Dakota has had 10,467 COVID-19 cases and 138 deaths. *Id.*

49.    As of August 26, 2020, Arizona—Plaintiff Cross' place of residence—has had 199,459 COVID-19 cases with 4,896 deaths.  *Id.*

**J.    Facts Related to the Qualitative Assessment of the Impact of COVID-19 on Defined Racial Minorities in the U.S.**

50.    "According to a secret report by the CDC [that the New York Times gained access to via a FOIA lawsuit] . . . the ethnicity [of a given COVID-19 patient] plays a major role in disease outcomes and that Black and Latino [as well as Native Americans] have been disproportionality affected throughout hundreds of counties in urban, suburban, and

rural areas" of the U.S. *See* Richard Oppel Jr., Robert Gebeloff, K.K. Rebecca Lai, Will Wright, and Mitch Smith, *The Fullest Look Yet at the Racial Inequality of the Coronavirus*, New York Times, July 5, 2020, https://www.nytimes.com/interactive/ 2020/07/05/us/coronavirus-latinos-african-americans-cdc-data.html. This is likely in part due to the fact that compared to the U.S. general population elderly Native people are less healthy and more likely to experience the following underlying medical conditions:

(a)  Congestive heart failure –  48.7% more likely;
(b)  Hypertension – 17.7% more likely;
(c)  Stroke – 17.5% more likely;
(d)  Asthma – 4.3% more likely; and
(e)  Diabetes – 173% more likely

*Native Elder Caregiver Curriculum*, pp. 26-27 *citing* Mouton, P.L., McDonald, L.R., Muus, K.J., Knudson, A.D., Ludtke, R.L., *Chronic Disease in American Indian/ Alaska Native Elders*.  The IHS Provider, 30(5), 120-123 (May 2005).

**K.    Facts Related to Risk of Travel During COVID-19 Pandemic**

51.    Americans from 26 states, including Plaintiff Cross' state of Arizona, should not be travelling right now, according to Harvard's Global Health Institute's recent risk assessment of non-essential travel during the present COVID-19 pandemic.   *See* Suzanne R. Kelleher, *Americans from 26 States Should Not Be Travelling Right Now, Per Harvard's Tracking Site*, Forbes, July 16, 2020.  This risk analysis concludes that "red-colored states (such as Arizona) . . . should be under stay-at-home orders."  *Id.*  Also, this "do not travel" assessment is independent of Cross' demonstrable and extreme physical disability, that is coupled with his compromised immune system due to the Mayo diagnosed tumor located at the T-6 vertebrae of his spine. *See* King Aff. Exhibit H (Plaintiff Cross' negative COVID-19 test result).

26

**L.**     **Facts Related to TBC's COVID-19 Policy on the Fort Berthold Reservation**

52.     COVID-19 is spreading through the community on the Fort Berthold Reservation.   Due to COVID-19, many public events have been canceled on the Reservation.   For example, the August 2020 Little Shell Celebration and Powwow was canceled in response to the pandemic.   Although COVID-19 statistics are not publicly available for the Fort Berthold Reservation, statistics for reservations on a larger scale are available. The rate of COVID-19 cases per one thousand people is more than four times higher for the populations residing on the reservations than for the U.S. as a whole. *See* Rodriguez-Lonebear, Desi PhD; Barceló, Nicolás E. MD; Akee, Randall PhD; Carroll, Stephanie Russo DrPH, MPH, *American Indian Reservations and COVID-19: Correlates of Early Infection Rates in the Pandemic,* Journal of Public Health Management and Practice: Volume 26 - Issue 4 - p 371-377, July/August 2020. Upon best information and belief, the TBC has not created any COVID-19 related voting policies or procedures.

53.     In light of the foregoing considerations, Plaintiffs Cross and Hudson believe that the TBC's "return to the Reservation to vote" requirement as implemented by the TBC, clearly violates, both facially and as applied, their fundamental right to vote that is conferred upon them by, as well as protected by, § 2 of the VRA, the TAT Constitution, the due process and equal protection clauses of the U.S. Constitution; the due process and equal protection clauses of the Indian Civil Rights Act of 1968;  Sections 16 and 17 of the Indian Reorganization Act (IRA) of 1934; numerous federal judicial decisions; and, finally, the federal guarantee to the MHA people, declared in the 1886 Agreement between those Indian people and the United States, that they will always be accorded the equal protection of the laws. *See* Act of March 3, 1891, ch. 543, § 23, Article V, 26 Stat.

27

989, 1032 (1891) ("[Dakota] Territory shall not pass or enforce any such law denying any such [MHA] Indian the equal protection of the law.").

54.    The tribal government's documented and on-going regulatory actions to severely burden, limit, or suppress the tribal voting rights of approximately 8,500 non-resident and adult members of the TAT—representing more than seventy-five percent of approximately 11,263 constitutionally qualified TAT voters—has been exacerbated by the advent of the present coronavirus ("COVID-19") pandemic that is now sweeping the Reservation and the rest of the world.

## VII.  CLAIMS FOR RELIEF

55.  Plaintiffs hereby reallege and incorporate by this reference all allegations contained in paragraphs 1-54 of this Complaint as fully set forth herein.

**A.     First Claim for Relief:  Defendant TBC's "return to the Reservation to vote" requirement and absentee balloting ordinances result in "vote denial" in violation of Section 2 of the VRA.**

56.    Plaintiffs are entitled to a declaratory judgment that the 1986 "return the Reservation to vote" requirement as implemented through the TAT's Election Ordinance violates § 2 of the VRA because it results in vote denial.

57.    Section 2 of the VRA, 52 U.S.C. § 10301 prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has either the purpose or result of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

58.    Section 2 of the VRA enforces the constitutional rights of the Fourteenth Amendment of the U.S. Constitution.  *See* Daniel P. Tokaji, *Applying Section 2 To The New Vote Denial,* 50 Harv. Civ. R.—C. L. L. Rev. 439, 468-69 (2015).

28

59.     The Fourteenth Amendment to the U.S. Constitution provides in relevant part:  "[N]or shall any [government] deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction equal protection of the laws."  It prohibits the imposition of severe burdens on the fundamental right to vote unless they are narrowly drawn to advance a compelling government interest.  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

60.     The burdens of the "return to the Reservation to vote" requirement and the requirement's implementation via Chapter VI, Section 1(A)(1)(a)-(e) of the Tribal Election Ordinance on Cross and other non-resident TAT voters are severe.

61.     Here, non-resident TAT members right to vote is burdened because many non-resident TAT voters, for a wide variety of legitimate reasons, cannot travel to the Reservation to vote.  As implemented through the TBC's Tribal Election Ordinance, the "return to the Reservation to vote" requirement results in absentee ballot availability for *resident* TAT members but not *non-resident* TAT members.  This disparate treatment in absentee ballot availability has resulted, and will continue to result in, disenfranchisement of Plaintiff Cross and other qualified non-resident voters, whereby they are precluded from participating in their own Tribal government.

62.     The TBC has not offered a "compelling" governmental interest that justifies this severe burden.  In fact, the TBC offered no justification whatsoever.

63.     Without an order from this Court, Defendant TBC will continue to violate the equal protection and due process clauses of the Fourteenth Amendment, resulting in "vote denial" of non-resident TAT voters in violation of § 2 of the VRA.

**B.      Second Claim for Relief: Defendant TBC's decision installing its "segment based" representational system on the Fort Berthold Reservation has resulted in the total exclusion of Plaintiff Cross, and his fellow non-resident TAT voters, from ever holding office within the TAT, from ever nominating a candidate of his or her choice to serve on the TBC or from ever having any voice in the financial or economic decision making within the TAT, all in violation of Section 2 of the VRA's prohibition of representational standards, practices or procedures that deny an identifiable group or class of otherwise eligible voters the equal protection and due process of law**

64.      Plaintiffs are entitled to a declaratory judgment that Defendant TBC has imposed—in 1956 and again in 1986—such substantial exclusionary standards, practices or procedures with respect to limiting, if not totally extinguishing, Plaintiff Cross' opportunity—along with those similar opportunities of thousands of his fellow, qualified, non-resident TAT voters—for political participation within the TAT, so as to amount to vote denial and vote dilution in violation of § 2 of the VRA.  First, its 1956 decision— birthed out of its Indian Termination Era agreement with then Secretary Wesley A. D'Ewart of the DOI—created two new and distinctively different groups of TAT members: a. one group that was highly politically and economically advantaged (residents of the Reservation) by being entitled to **hold** (emphasis added) TAT office and to **nominate** (emphasis added) candidates to the TAT governing body by virtue of Defendant TBC's newly installed system of political governance—reviewed and approved by Secretary D'Ewart pursuant to Section 16 of the IRA—on the Reservation (TAT Constitution, Article III, Governance, Sections 1-6, Added by Amendment No. 1, effective October 14, 1956); and b. one group that was severely politically and economically disadvantaged (non-residents of the Reservation) by being forever **barred from holding** (emphasis added) TAT office and **barred from nominating** (emphasis added) candidates to the TAT governing body by virtue of Defendant TBC's newly installed system of political

governance on the Reservation.   Second, Defendant TBC's 1986 decision—taken independent now of any possible economic or political coercion by the DOI—nonetheless 'doubled-down' on its earlier 1956 decision so as to strengthen the advantage of its politically and economically favored group (residents of the Reservation) and to deepen the disadvantage of its disfavored group of TAT members (non-residents of the Reservation) by: a. ending that disfavored group's historic right to vote by absentee or mail-in ballot—a right insisted upon by Secretary D'Ewart so as to encourage as many as possible  of the young, educated and vital residents of the Reservation to "relocate" from the Reservation to America's urban job centers under the BIA's Urban Indian Relocation Program—without any prior notice to, or justification thereof, that affected group. *See* King Aff. Exhibit D (July 23, 1956 Letter of Assistant Secretary of Interior Wesley A. D'Ewart); and b. imposing on that disfavored group the wholly new requirement that they **must** (emphasis added) "return to the Reservation to vote" in order to cast a valid ballot regardless of their personal physical or economic circumstances—such as Plaintiff Cross' undisputed extreme physical disability—that makes it practically impossible for him or them to comply with that TBC imposed requirement.

>    **C.**      **Third Claim for Relief:  Injunction**

>       65.      Plaintiffs are entitled to injunctive relief prohibiting enforcement of the "return to the Reservation to vote" requirement and ordering an absentee balloting process whereby all non-resident, enrolled TAT members, eighteen (18) years of age or older, are to be afforded an opportunity to vote by absentee or mail-in ballot in the 2020 TAT general election of the Fort Berthold Reservation.

31

## VIII. JUDICIAL RELIEF REQUESTED

66.     WHEREFORE, in light of the foregoing, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant on each Claim for Relief set forth herein, and issue the following relief:

Plaintiffs respectfully request that the Court grant their Motion for Declaratory and Injunctive Relief by issuing the following relief:

1.     **For declaratory relief pursuant to § 2 of the VRA decreeing that:**

### VOTE DENIAL

A.     Defendant TBC's 1986 promulgated "return to the Reservation to vote" requirement constitutes "vote denial" via a prohibited voting practice, procedure or standard within the meaning of § 2 of the VRA and, therefore, violates, both facially and as applied, Plaintiffs' rights to the equal protection and due process of law (TAT Constitution, Article IV, Section 2(b) and TBC Election Ordinance, Chap. I, Section 3(b) and Chap. VI, Section 1(A)(1)(a-e)); and

### VOTE DILUTOIN

B.     Defendant TBC's 1956 promulgated "segment based" system of political representation on Fort Berthold Reservation—whereby between 3/4 to 4/5 of the hitherto wholly equal TAT members, including Plaintiff Cross, have been forever stripped of their fundamental political rights to **hold** (emphasis added) office in the TAT, **nominate** (emphasis added) candidates of their choice or to secure **representation** (emphasis added) on the TAT governing body—constitutes "vote dilution" via a prohibited representational practice, procedure or standard within the meaning of § 2 of the VRA and, therefore, violates, both facially and as applied, Plaintiffs' right to the equal protection

and due process of law. (TAT Constitution, Article III, Governing Body, Sections 1-6 (As amended by Amendment No. 1, effective October 16, 1956)).

**2.      For the following equitable order in the form of injunctive relief:**

A.      That a Special Master be appointed pursuant Fed. R. Civ. P. 53 to oversee:

(1)      the administration of a mail-in balloting process for the scheduled 2020 TAT General Election  whereby all enrolled, eligible (18 years of age or older), non-resident TAT members are afforded a timely and reasonable opportunity to vote by mail-in ballot in the 2020 General TAT Elections; and

(2)       the development and promulgation by the 2022 TAT elections, and as ratified by a TAT member-wide referendum election, of a fair and equal representational system establishing Fort Berthold Reservation as a single electoral district with seven (7) 'at large' elected TAT representatives (six (6) Council members and one (1) Chair) who will represent all TAT members.

B.      The Special Master shall take all appropriate, reasonable and prudent steps to ensure with respect to items (1) and (2) of his above assigned duties and responsibilities that:

**VOTE DENIAL**

(1)      The TEB develops an intelligible and plainly written primary and general election ballot for use by an average non-resident TAT voter, subject to the review and approval of the Special Master;

(2)      The TEB develops and/or prepares an updated and accurate list of the names, addresses, and phone numbers and/or emails of all enrolled, non-resident TAT members, subject to the review of the Special Master, who are eighteen (18) years of age

33

or older and who are, therefore, presumptively entitled to vote in the 2020 general election;

(3)     The TEB develops and/or prepares a timely and reasonable schedule, subject to the review of the Special Master, for the actual "mailing out" of the 2020 general election ballot to the enrolled, non-resident TAT voters so that they will be allowed at least two (2) weeks, after their expected receipt of their ballots, in which to consider their electoral choices or options, prior to their choosing their preferred candidate(s) for tribal office and returning their marked and signed ballot(s) in the stamped postage paid, self addressed to the TEB, return mailer;

(4)     The TEB develops and/or prepares a brief, intelligible, and clear instructional letter that is directly addressed to "Dear non-resident TAT voter" and that reassures him or her that he/she has the right to vote in the 2020 general TAT election by completing the enclosed ballot as instructed, by clearly marking or indicating the candidate(s) of his or her choice, by signing the ballot and returning it in the enclosed postage paid, self-addressed mailer on or before the posted dated of the particular election (primary or general) involved;

(5)     The TEB develops and/or prepares a regulatory process for the safe and controlled receipt and storage of all absentee or mail in ballots that are cast by non-resident TAT voters in the TAT 2020 general election; furthermore, that process design standards, requisite security protocols, as well as the identity, requisite qualifications, as well as those specifically assigned duties and responsibilities of those assigned TEB officials and/or staff who may be entrusted with receiving, processing, and storage of the ballots, shall be subject to the review of the Special Master;

(6)     The TEB develops and/or prepares a regulatory process, subject to the review of the Special Master, for the opening and counting of all the secured ballots that have been cast by the enrolled, adult non-resident TAT voters in the 2020 general election; and opening and counting of said ballots by any officials and staff of the TEB **shall** only take place in the presence of the Special Master or his designee;

(7)     The TEB develops and/or prepares a regulatory process, subject to the review of the Special Master, for the identification and segregation of any and all ballots that are cast by non-resident, adult TAT members that are alleged by the TEB to be invalid because of (a) the receipt of said ballot was not postmarked on or before the date of the 2020 TAT general election as the case may be; (b) the said ballot was not signed by the specific and affected non-resident, adult TAT voter involved; (c) the said ballot of a specific and identified non-resident TAT voter was deemed spoiled by the TEB due to mismarking the said ballot; or (d) other alleged material deviations from established TEB balloting standards; and

(8)     The TEB develops and/or prepares an unofficial tally and count, subject to review and approval of the Special Master, of the those ballots that were cast and for which specific candidate(s) those ballots were so cast, by the non-resident, adult TAT voters in the 2020 TAT general election; and the Special Master, upon the completion of his review and approval, of those TEB tallies and counts as consistent with and reflective of actual, expressed will and intent of those ballots that were cast by the non-resident, adult TAT voters, *in toto*, shall prepare and certify a final count and report of the results of that balloting process in the 2020 general TAT elections.

**VOTE DILUTION**

C.      With respect to Plaintiffs' vote dilution claims:

(1)      The Special Master shall review and assess alternative representational plans or models for structuring a fair and equal representational system on the Fort Berthold Reservation;

(2)      He shall inform the present TBC incumbents and the newly elected three (3) TBC representatives that they shall be allowed to serve out their constitutionally defined terms as the "interim government" of the TAT;

(3)      He shall develop an appropriate and fair representational system on Fort Berthold via consultation with interested parties such as the BIA/DOI and leading experts in political representation theory and practice;

(4)      He shall require Defendant TBC to submit any proposed voting rights change to him for approval under § 3 of the VRA;

(5)      He shall order an audit of the present financial health and status of the TAT pursuant to Section 9 of the TAT Corporate Charter and his delegated equitable powers of the Court;

(6)      He shall consider the advisability of entering a "stand still" order whereby the interim tribal government is prohibited from expending TAT monies and funds over an above defined amount without his express approval to do so; and

(7)      He shall arrange, supervise and conduct a TAT member wide referendum election wherein the majority vote of the eligible TAT members actually voting shall be binding and validate the election regarding the adoption of his proposed representational

plan in consultation and/or cooperation with the BIA/DOI at least six (6) months before the 2022 TAT primary and general elections.

Respectfully submitted this _29th_ day of September, 2020.

ZUGER KIRMIS & SMITH, PLLP
Attorneys for Plaintiffs
PO Box 1695
Bismarck, ND 58502-1695
701-223-2711
lking@zkslaw.com
dpathroff@zkslaw.com

By: _____
Lawrence E. King   ID#04997
Dennis Pathroff    ID#08607

37