7/28/20

| | |
|---|---|
| 1  THREE AFFILIATED TRIBES | SUPREME COURT |
| 2 | |
| 3  FORT BERTHOLD RESERVATION | NEW TOWN, ND 58763 |

Raymond Cross;                                     )
Marilyn Hudson.                                   )
           Plaintiffs/Appellants.        )   **ORDER**
                        )
                        )   Case No. AP 2019-AP-006
    **vs.**                  )
                        )
Mark Fox, individually and as a        )
member of the Three Affiliated         )
Tribes Tribal Business Council;        )
Randy Phelan, individually and         )
as a member of the Three               )
Affiliated Tribes Tribal Business      )
Council; Fred Fox, individually        )
and as a member of the Three           )
Affiliated Tribes Tribal Business      )
Council; Mervin Packineau,             )
individually and as a member of        )
the Three Affiliated Tribes Tribal     )
Business Council; Frank Grady,         )
individually and as a member of        )
the Three Affiliated Tribes Tribal     )
Business Council; Cory Spotted         )
Bear, individually and as a            )
member of the Three Affiliated         )
Tribes Tribal Business Council;        )
Monica Mayer, individually and         )
as a member of the Three               )
Affiliated Tribes Tribal Business      )
Council.                               )
                        )
       Defendants/Appellees.         )

     The Fort Berthold District Court issued its Opinion and Order, in the above-

captioned matter on August 5, 2019, granting the Defendants summary judgment and

dismissing Plaintiff's claims. The Plaintiff's appealed the summary judgment to the MHA

Nation Supreme Court, filing a Notice of Appeal on October 24, 2019. Accompanying the

Notice of Appeal were the Appellants Brief and a Request for Oral Argument. The

Appellees' Brief was filed on November 13, 2019. The Plaintiffs filed a Motion for

EXHIBIT

tabbies

B

44   Additional Briefing, Brief in Support of Motion and Reply Brief on December 9, 2019. The
45   Defendants opposed the Plaintiffs Motion for Additional Briefing. This Court denied
46   additional briefing but granted the Plaintiffs Request for Oral Argument. Oral Argument in
47   the above-captioned matter was held on June 3, 2020. Due to the current global pandemic,
48   the health and safety of litigants, court personnel and Justices dictated that oral arguments
49   in the above-captioned matter occurred via a virtual platform. All parties were present at
50   oral argument.

51

52                                    **BACKGROUND**

53           The Plaintiffs, Raymond Cross and Marilyn Hudson, are both enrolled members of
54   the Three Affiliated Tribes. Marilyn Hudson is a resident of the Fort Berthold Reservation
55   while Raymond Cross is a non-resident. At the heart of this case is a 1986 amendment to
56   the TAT Constitution stating that "...an eligible voter of the Three Affiliated Tribes, whose
57   place of legal residence is located outside of the exterior boundaries of the Ft. Berthold
58   Reservation on the date of an election, shall return to the Reservation in order to vote in
59   the appropriate segment polling place on the date of the election.". *Article IV § (2) b) of the*
60   *TAT Constitution (as amended 1986).*

61           This cause of action was initiated on November 2, 2018 when the Plaintiffs filed a
62   complaint in the Fort Berthold District Court requesting a preliminary injunction. The
63   complaint specifically requested that absentee ballots be made available to non-resident
64   voters and that the court order a stay of the November 6, 2018 election results until such
65   time as absentee ballots could be distributed and processed. The complaint also requested
66   that the lower court enjoin the enforcement of the "return to reservation" requirement of
67   the TAT Constitution and asked for declaratory judgment invalidating the "return to
68   reservation" provision of the TAT Constitution. The Defendants, elected members of the
69   Three Affiliated Tribes Tribal Business Council ("TBC") filed a motion to dismiss the
70   complaint. The Plaintiffs responded to the Motion to Dismiss, and the Defendants replied to
71   the responsive pleading.

72           The District Court denied the request for preliminary injunction and converted the
73   TBC motion to Dismiss to a motion for summary judgment on grounds that the facts of the
74   case were not in dispute and could thus be appropriately determined by summary

75  judgment. The District Court heard oral arguments on May 30, 2019, and issued an

76  Opinion and Order on August 5, 2019 wherein it granted summary judgment to the

77  Defendants and dismissed the case.

78                                    **ISSUE(S)**

79

80  The issue before this Court is whether the Fort Berthold District Court erred when it

81  granted summary judgment to Defendants and dismissed the lower court cause of action.

82

83                                    **ANALYSIS**

84          The first issue raised by Plaintiffs on appeal relates to the lower court's treatment of

85  the Motion to Dismiss as a motion for summary judgment. To this issue the Tribal Rules of

86  Civil Procedure are clear "A motion to dismiss may be treated as a motion for summary

87  judgment"[1]. The decision to treat a motion to dismiss as a motion for summary judgment

88  rests in the complete discretion of the trial judge and we find no error in the court doing so

89  in this case. Absent procedural error on the part of the lower court we turn to the

90  substantive arguments made on appeal.

91          The Three Affiliated Tribes (the "Tribe") opted to be federally recognized in

92  accordance with the Indian Reorganization Act of 1934 ("IRA"). Generally speaking, the

93  IRA was an attempt by the United States Congress to support tribal self-determination,

94  recognizing tribal sovereignty as an absolute and subject only to the express Congressional

95  limitations provided in treaties or legislation. Shortly after electing to reorganize in

96  accordance with the IRA, the Tribe adopted a tribal constitution and bylaws thereby

97  providing a framework for the exercise of self-governance. It is important to note that

98  although the IRA contained a provision for supporting efforts of tribes to "...adopt an

99  appropriate constitution and bylaws...", the Act itself did not contain any mandated

100 language for tribal constitutions.[2] Creation of tribal constitutions, and amendments, was

101 and remains an act of self-determination rooted in inherent sovereign rights of the tribes to

---

[1] Tribal R. Civ. P. 6.

[2] Felix S. Cohen, *On the Drafting of Tribal Constitutions* 3 (2006); many tribes opting for federal recognition under the IRA adopted a template constitution that was circulated by the Bureau of Indian Affairs after the Act was passed however there was no federally mandated language relevant to Tribal Constitutions.

102     self-govern. To this end, tribes have great latitude in shaping their branches of government,

103     specifying leadership roles and responsibilities, establishing qualifications for tribal

104     government officials, determining membership, citizenship and voter eligibility criteria and

105     creating individual rights within their constitutional framework.

106          For many tribes, constitutional reform has been a necessary part of the evolution of

107     self-governance. Early tribal constitutions oftentimes provided an inadequate framework

108     to meet the important and diverse roles necessary for comprehensive self-governance.

109     Relevant to the Tribe in this action, and since the original enactment of the Tribe's

110     Constitution and Bylaws, constitutional reform and amendment has occurred.[3] In

111     accordance with Article X of the TAT Constitution, any amendments to the Tribe's

112     Constitution may occur only "...by a majority vote of the qualified voters of the tribes voting

113     at an election called for that purpose by the Secretary of the Interior... no amendment shall

114     become effective until it shall have been approved by the Secretary of the Interior.  It shall

115     be the duty of the Secretary of the Interior to call an election on any proposed amendment

116     when requested by a two-thirds (2/3) vote of the Tribal Council, or upon presentation of a

117     petition signed by one-third (1/3) of the qualified voters".[4] In this case, all parties agree

118     that the proceedings for adoption of the 1986 amendments to the Tribe's Constitution were

119     conducted in a manner consistent with Article X of the TAT Constitution as well as

120     applicable provisions found in the Code of Federal Regulations pertaining to Secretarial

121     Election Procedures.[5] Absent any error by the lower court relevant to procedural findings

122     regarding the 1986 amendment process, the Court will move on to consider the lower

123     court's substantive findings regarding the 1986 amendments to the Tribe's Constitution.

124          The Plaintiffs in this case contend that, despite the absence of procedural

125     irregularity in the 1986 Tribe's Constitutional Amendment, the return to reservation

126     language incorporated in the nonresident voter provisions of the Tribe's Constitution

127     conflict with other provisions within the same Constitution, violates their civil liberties

128     under the ICRA and as such should be deemed unlawful.

---

[3] Approved June 29, 1936; Amendments authorized after Secretarial Election(s)/ Referendum(s) in 1956, 1961, 1970, 1974, 1985, 1986, and 2010.
[4] Article X- Amendments, TAT Constitution.
[5] 25 C.F.R. 81

129     Plaintiffs contend that the conflicting constitutional provisions within the Tribe's
130   Constitution warrant a finding that Article IV, § 2(b) be determined unlawful or
131   unconstitutional. In particular, the Plaintiffs cite to Article IV, § 2(b) requiring that non-
132   residents return to the reservation to vote and Article VI, § 3(b) granting the Tribal Court
133   the authority to enforce ICRA provisions as being in conflict. The lower Court addressed
134   this argument and determined that one provision of the Constitution cannot be "rendered
135   unconstitutional" by another provision of the Constitution, and further determined that
136   where ambiguities exist the court must "...give effect and meaning to every constitutional
137   provision and reconcile, if possible, apparently inconsistent provisions."[6] The Court went
138   on to find that there was no ambiguity between the Article IV, § 2(b) and Article VI, § 3(b).[7]
139   This Court agrees and finds both cited provisions of the Tribe's Constitution to be clear,
140   unambiguous and fully enforceable. Although we find no ambiguity with the cited
141   Constitutional provisions, we must still consider the impact of the ICRA, if any, on the laws
142   impacting voters.
143     Since the Marshall trilogy emerged in the United States Supreme Court, an entire
144   body of federal common law has examined the extent to which federal law applies to the
145   interpretation and application of tribal laws, including instances involving intratribal
146   matters. The United States Supreme Court, in *Talton v. Mayes*[8], made it clear that the federal
147   constitutional rights do not apply to actions of tribal governments. In fact, prior to 1968,
148   there was no federal legislation to protect individual tribal members against actions of
149   tribal governments.[9] This is not to say that tribes generally lacked any protections or
150   individual civil liberties, however, any such rights were afforded as a matter of tribal law
151   and not federal law.
152     In 1968, the U.S. Congress passed the Indian Civil Rights Act. This legislation was
153   clearly intended to expressly limit the actions of tribal governments by prescribing
154   definitive civil liberties for tribal members. The guarantees afforded to individuals under

---

[6] See FBDC Opinion and Order at page 6 (August 5, 2019).
[7] See FBDC Opinion and Order at page 7 (August 5, 2019)
[8] 163 U.S. 376 (1898)(finding that the Fifth Amendment of the U.S. Constitution did not apply to laws of the Cherokee Nation and further determining that the authority to interpret Cherokee law rested solely with the courts of the Cherokee Nation)
[9] 25 U.S.C. §§ 1301-1304

155    the ICRA, however, are not the equivalent of guarantees afforded under the United States

156    Constitution. .[10]

157         In *Santa Clara v. Martinez*[11], the United States Supreme Court issued an opinion that

158    has dramatically impacted the interpretation and enforcement of ICRA. In *Santa Clara*, the

159    United States Supreme Court dismissed an action seeking declaratory and injunctive relief

160    relevant to a tribal membership ordinance that restricted tribal membership in inter-tribal

161    marriages to children born of male members of the tribe. In reaching this conclusion, the

162    United States Supreme Court determined that "...in the absence here of an unequivocal

163    expression to the contrary legislative intent, we conclude that suits against the tribe under

164    the ICRA are barred by its sovereign immunity from suit"[12]. The United State Supreme

165    Court also recognized the dual statutory purposes of the ICRA which were intended to both

166    strengthen tribal self-determination while also strengthening the position of individual

167    members in relation to the tribe.[13] When interpreting and applying the rights afforded by

168    virtue of the Indian Civil Rights Act, courts must consider the rights of individuals while

169    also honoring the sovereignty, custom and tradition of tribes that the Act professed to

170    further.

171         In this case, the lower court recognized the authority of the Tribal Court to enforce

172    the provisions of the ICRA.[14] The lower court went on to state that the ICRA would only

173    apply "if it determined through an adjudication that the TBC has in specific instance

174    violated the Act"[15]. The court found that the TBC could not have violated the Act based

175    upon the 1986 Constitutional Amendment in large part due to the fact that the TBC has no

176    authority to amend the TAT Constitution. Rather that authority rests exclusively with the

---

[10] See *Wounded Head v. Oglala Sioux Tribe*, 507 F.2d 1079 (8th Cir. 1975)(recognizing that the power of Indian tribes to govern their own affairs is limited by treaty and the plenary power of Congress); See also *Tom v Sutton*, 533 F.2d 1101 (9th Cir 1976)(noting that due process and equal protection under the ICRA have been construed with due regard to historical, governmental and cultural values of a respective Indian tribe; and further acknowledging that rules of constitutional construction require interpretation in light of the entire document, to be construed in harmony with each other if possible.)

[11] 436 U.S. 49 (1978)("As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority.")

[12] Id. At 55, 59

[13] Id. At 62, 64.

[14] See page 4 Opinion and Order of FBDC (August 5, 2019)(noting that the relief available for alleged ICRA violations was limited to injunctive relief).

[15] Id.

177  qualified voters of the tribe.[16] In other words, even if the TBC wanted to amend the

178  Constitution, there is no such authority vested within the governing body to do so absent a

179  Secretarial Election. This Court agrees that the TBC has no authority to independently

180  amend provisions of the Tribal Constitution nor are they at liberty to pick and choose

181  which provisions of the Tribal Constitution they will adhere to or enforce. Should members

182  of the Tribe wish to amend the Tribal Constitution, there is a process to do so set forth in

183  Article X of the Constitution. Finding no error by the lower court relevant to procedural or

184  substantive findings regarding the 1986 amendment we will move on to the remaining

185  issues pertaining to alleged restraints on the civil liberties alleged by the Plaintiffs.

186       Although the lower court declined to find the 1986 Amendment unlawful under an

187  ICRA analysis, that does not in and of itself resolve the civil liberties issues raised by

188  Plaintiffs. The rights of tribal members to vote and participate in the tribal electoral

189  process is a matter of tribal law and not federal law. As tribes enacted constitutions and

190  bylaws they have done so as an exercise of inherent sovereignty. Tribes across the nation

191  vary dramatically in defining voter eligibility and the procedures that apply to voting.[17] It

192  is within the inherent sovereignty of the tribe to determine whether and electoral process

---

[16] Title X TAT Constitution.

[17] See examples of Constitutions and Bylaws of the following IRA Tribes:
Blackfeet Nation of Montana Constitution (stating in relevant part that any member of the Blackfeet Tribe, 18 years of age or over, shall be eligible to vote at any election when he or she presents himself or herself at a polling place within his or her voting district); Tohono O'odham Nation (stating in relevant part that all members who have reached the age of 18 years prior to the election have the right to vote provided they comply with any and all ordinances regulation elections authorized by the Constitution); Mashantucket Pequot Tribe (stating in relevant part that all tribal members who are of age 18 years or older shall be voting members but also stating that no votes may be cast by proxy or absentee ballot); Gila River Indian Community(Stating in relevant part that all adult members who have attained the age of 21 years shall, unless non compos mentis, have the right to vote in any election); Havasupai tribe of the Havasupai Reservation of Arizona (stating in relevant part that the members of the Tribal Council must be comprised of eligible voters age 35 or older and also stating that only enrolled members over the age of 21 years will have the right to vote); Pueblo of Isleta (stating in relevant part that enrolled members of age 18 years or older shall be eligible to vote, provided they register; early voting is authorized pursuant to ordinance).

There exist many additional examples of tribal constitutions that demonstrate variances in governance structures and voter qualifications. For example, some tribes have defined branches of government, while others vest all duties in a singular branch; tribes also vary in terms of required qualifications membership or citizenry, voter rights, criteria for government leadership and again still for the manner in which elections are conducted. Ultimately, tribal governments retain the inherent authority to determine their own governance structures. see Tribal Nations and the United States: An Introduction, National Congress of American Indians, (February 2020), at 22 and 32
http://www.ncai.org/tribalnations/introduction/Tribal_Nations_and_the_United_States_An_Introduction-web-.pdf)

193    will be incorporated into their self-governance and to further define voter eligibility and

194    rights. To this end there is nothing to preclude a tribe from limiting eligible voters by

195    membership status, age and even residency as is reflected in the TAT Constitution. Once a

196    tribe has established a right by virtue of the tribal constitution, it then follows that the

197    tribal governing body does not infringe upon such rights in an unlawful manner.[18]

198        At the heart of this case the Plaintiffs argue that rights of non-resident enrolled

199    members to vote in tribal elections have been unduly burdened by the return to

200    reservation voting requirement of the Tribe's Constitution. Plaintiffs contend that the

201    manner in which ballots may be cast by resident versus non-resident voters has resulted in

202    a violation of their rights to due process and equal protection under the ICRA. There is no

203    question that resident and nonresident members are treated differently under current

204    tribal law. However, the differential treatment relates exclusively to absentee balloting.[19]

205    In other words resident voters may qualify for an absentee ballot while non-resident voters

206    cannot. Outside of absentee balloting, all eligible voter must register and cast ballots on the

207    reservation at a polling site. We are not convinced that the Tribe's Constitution is the

208    source of disparate treatment of resident and non-resident voters. In fact, when

209    considering the language of the Tribe's Constitution and Election Ordinance

210    simultaneously, both resident and non-resident voters must register with a segment and

211    report to a segment polling place to cast their ballot. Resident voters must register in the

212    segment where they reside while non-residents are afforded a one-time opportunity to

213    choose the segment that they will vote in. Beyond the initial choice of segment, the only

214    clear distinction between resident and nonresident voters, in terms of process for casting

215    ballots, can be found in the Title XII of the tribal code governing tribal elections. Title XII is

216    clear that absentee ballots will be afforded to qualifying resident voters but not to non-

217    resident voters. There is no question that resident and nonresident voters are treated

218    differently under the law, however the differential treatment only relates to absentee

---

[18] See 25 USC § 1302

[19] See Santa Clara Pueblo v. Martinez, 436 U.S. 49 (1978)(finding that the lawfulness of a tribal membership ordinance treating the children of certain male members of the tribe differently than the children of certain female members of the tribe is reserved for tribal determination; the Court also noted lower court findings that the ordinance "...reflected traditional values of patriarchy significant in tribal life" thereby sustaining the validity of the ordinance)

219   balloting.  Outside of absentee balloting, all eligible voters must register and cast ballots on

220   the reservation at a polling site.

221          The question thus becomes whether the TBC has violated the equal protection

222   provision of the ICRA by creating a legislative exception to the on reservation voting

223   requirement for resident voters without affording the same or similar exceptions to non-

224   resident voters. Under a U.S. Constitutional analysis, when an equal protection violation is

225   alleged to have occurred the Court will consider whether the law impacts a suspect class or

226   a fundamental right to determine the proper legal analysis.  If the U.S. Supreme Court finds

227   that a suspect class or fundamental right is impacted, the governmental action will be

228   subject to review under an intermediate or strict scrutiny analysis.  It is important to note,

229   however, that the U.S. Supreme Court has been clear that the standards applicable to rights

230   afforded under the U.S. Constitution are not applicable to the rights afforded under the

231   ICRA.  The level of scrutiny to be applied to legislative actions of the TBC, is therefore, a

232   matter tribal interpretation and of first impression for this Court.

233          Although this Court is not required to follow the same legal analysis applicable to

234   rights afforded under the U.S. Constitution, in this case we find no existence of a suspect

235   classification based upon race, religion, national origin or alienage. The only distinction to

236   be drawn between the groups represented in this case are based upon residency of voters.

237   Despite the absence of what might be considered a suspect classification, the right to vote is

238   one that is considered to be a fundamental right under both federal and state law. Although

239   this Court is not required to treat the right to vote as a fundamental right under tribal law,

240   it is within the discretion of tribal courts to classify tribal voting rights in tribal elections as

241   fundamental.

242          If we were to consider tribal voting rights afforded by tribal constitutions to be held

243   to a similar standard as those in state or federal jurisdictions, it would follow that any laws

244   passed by tribal governments that infringe upon the individual's right to vote shoud be

245   reviewed with a strict scrutiny analysis.  Under such analysis, the tribal government would

246   be required to narrowly tailor legislation to achieve a compelling governmental interest

247   when passing legislation that infringes upon a fundamental right. The record is

248   insufficiently developed for us to determine whether the equal protection guarantees of the

249   ICRA have been violated by the absentee voting provision of the Tribal Election Ordinance

250 or whether the TBC may have had a compelling interest in amending Title XII of the tribal
251 code to treat residents and non-residents differently with respect to the absentee ballot
252 provisions.
253
254          **CONCLUSION**
255    Based upon the forgoing, we affirm the decision of the lower court in so far as
256 Article IV, § 2(b) and Article VI, § 3(b) of the Tribe's Constitution are concerned.  However,
257 we remand to the lower court for further proceedings and instructions to determine
258 whether the absentee ballot provisions of the election ordinance found in the Title XII of
259 the tribal code violate the ICRA.
260
261
262 It is so Ordered this *28th* day of July, 2020.
263
264
265 (SEAL)
266         MICHELLE RIVARD PARKS
267         CHIEF JUSTICE
268         MHA NATION SUPREME COURT
269
270         JAMES MAXSON
271         JUSTICE
272         MHA NATION SUPREME COURT
273
274         JOHN MAHONEY
275         JUSTICE
276         MHA NATION SUPREME COURT

7/28/20

**MANDAN, HIDATSA & ARIKIRA**
**FORT BERTHOLD RESERVATION**

**IN MHA SUPREME COURT**
**NEW TOWN, NORTH DAKOTA**

| | |
|---|---|
| Raymond Cross, )<br>Marilyn Hudson, )<br>          Plaintiffs/Appellants. )<br> )<br>     vs. )<br> )<br>Mark Fox, individually and as a )<br>Member of the Three Affiliated )<br>Tribes Tribal Business Counsel; )<br>Randy Phelan, Individually and )<br>as a member of the Three )<br>Affiliated Tribes Tribal Business )<br>Counsel; Fred Fox, individually )<br>and as a member of the Three )<br>Affiliated Tribes Tribal Business )<br>Counsel; Mervin Packineau, )<br>individually and as a member of )<br>the Three Affiliated Tribes Tribal )<br>Business Counsel; Frank Grady, )<br>individually and as a member of )<br>the Three Affiliated Tribes Tribal )<br>Business Counsel; Cory Spotted Bear, )<br>Monica Mayer, individually and as a )<br>Member of the Three Affiliated Tribes )<br>Tribal Business Counsel )<br> )<br>          Defendants/Appellees, )<br> ) | Certificate of Service by Mail<br>Case No. CV- 2018-0530<br>Case No. AP-2019-006 |

State of North Dakota   )
                        ) ss.
County of Mountrail     )

COMES NOW, Amanda Deville, Supreme Court Clerk and states the following:

That an Order and Certificate of Service was served by me on the following individuals by sending true and correct copies of such documents in the U.S. Mail postage prepaid, in New Town, North Dakota addressed as follows on the 4th day of August, 2020.

Rev. April 2019

**Plaintiffs/Appellants**
Lawrence King
PO Box 1695
Bismarck, ND 58502
lking@zkslaw.com


**Defendant/Appellees**
Ryan Dreveskracht
PO Box 15146
Seattle, WA 98115
ryan@galandabroadman.com


I further certify that I am over eighteen years of age and am not a party to this action.

Dated this 4th day of August 2020.

*Amanda Deville*
Amanda Deville,
MHA Supreme Court Clerk

Rev. April 2019