**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Raymond Cross;<br>Marilyn Hudson<br><br>                    *Plaintiffs*,<br><br>v.<br><br>Mark Fox, individually and as a<br>member of the Three Affiliated<br>Tribes Tribal Business Council;<br>Randy Phelan, individually and<br>as a member of the Three<br>Affiliated Tribes Tribal Business<br>Council; Fred Fox, individually<br>and as a member of the Three<br>Affiliated Tribes Tribal Business<br>Council; Mervin Packineau,<br>individually and as a member of<br>the Three Affiliated Tribes Tribal<br>Business Council; Judy Brugh,<br>individually and as a member of<br>the Three Affiliated Tribes Tribal<br>Business Council; Cory Spotted<br>Bear, individually and as a<br>member of the Three Affiliated<br>Tribes Tribal Business Council;<br>Monica Mayer, individually and<br>as a member of the Three<br>Affiliated Tribes Tribal Business<br>Council<br><br>                    *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO._____<br><br><br><br>**MEMORANDUM OF LAW IN SUPPORT**<br>**OF MOTION FOR DECLARATORY**<br>**AND INJUNCTIVE RELIEF** |

1.      Plaintiffs Raymond Cross and Marilyn Hudson, by and through their undersigned counsel, respectfully submit this *Memorandum of Law in Support of Motion for Declaratory and Injunctive Relief* against the Tribal Business Council of the Three

1

Affiliated Tribes ("TAT") and the members of the Tribal Business Council, individually (hereinafter, collectively, "Defendant TBC").

## I.  INTRODUCTORY STATEMENT

2.    Defendant TBC established in 1956 and 1986   voting and/or representational practices, standards or procedures in violation of § 2 of the VRA that have continued to **a.** deny Plaintiff Cross' undisputed right to vote—as well as those of his fellow qualified, non-resident TAT voters—in all TAT elections by impermissibly burdening his exercise of that right via its imposition of its 1986 "return to the Reservation to vote" requirement in all TAT elections and **b.** dilute, by its 1956 action, Cross' political participatory and representational rights by totally and permanently excluding him—as well as his  fellow qualified, non-resident TAT voters who now constitute between 75%-80% of the enrolled TAT membership—from ever **holding** (emphasis added) any political office within the TAT, ever **nominating** (emphasis added) any political candidate of their choice and ever securing **representation** (emphasis added) on the TAT's governing body.

### A.    Vote Denial Under Defendant TBC's 1986 Action

3.    Defendant TBC has **denied** (emphasis added) Plaintiff Cross' undisputed and fundamental right to vote—as well as those equally undisputed voting rights of his fellow non-resident TAT voters—in all TAT elections by:

a.    requiring them to "return to the Reservation to vote" in all TAT elections regardless of their personal circumstances—such as their advanced age, their severe physical disability, their poverty, their military service obligations, their college or trade school attendance, their employment duties or their parental and/or elder care

responsibilities—that make it practically impossible for them to comply with the Defendant TBC imposed and presently enforced requirement. For example, Plaintiff Cross suffers from a medically documented extreme physical disability that makes it virtually impossible for him to travel. Nevertheless, he **must** (emphasis added), by virtue of this 1986 Defendant TBC's order, return to the Reservation in order to vote in both the primary and general 2020 TAT elections, despite the fact that he resides over 1500 miles, one way, from the Reservation in Tucson, Arizona, and despite the fact that he must have a companion or assistant (usually his wife) travel with him so as to meet his medical and other personal needs during his travels. *See* TAT Election Ordinance, Chapter 1, Section 3(B) ("Each qualified voter, who is not a legal resident of the Fort Berthold Reservation on the date of an election . . . shall return to the reservation in order to vote in the election.");

b.      denying Plaintiff Cross, along with his fellow non-resident TAT voters, access to Defendant TBC's contemporaneously legislated literal raft-load of easy to obtain regulatory exemptions—known as absentee ballots—that relieved the holder thereof from having to physically appear at his or her assigned Reservation polling site on TAT election day. But these regulatory exemptions are available to only **resident** (emphasis added) TAT voters. *See* TAT Election Ordinance, Chapter VI, Section 1(A)(1)(a)(e)[1]. Regardless, Plaintiff Cross applied to the TBC Election Board in late

---

[1] Chapter VI, Section 1(A)(1)(a)-(e), Procedures for Resident Voting by Absentee Ballot, TAT Election Ordinance provides as follows:

> A qualified voter, who is a legal resident of the Fort Berthold Reservation . . . may register to vote and cast his/her ballot in accordance with the procedure prescribed in this Chapter, only if one of the following conditions is satisfied . . . . He/she will be absent from the Reservation on the date on which the election is to be held  . . . for only the following acceptable conditions:
> a.      Absence due to duly scheduled work related travel;

3

Spring, 2018, for an absentee ballot that would have enabled him to vote in the pending TAT elections of that year. His application for that absentee ballot was based on his "extreme physical disability"—an expressly recognized basis for obtaining such a ballot by Section 1(A)(1)(d) of the TBC Election Ordinance. However, that Board summarily and arbitrarily denied Cross' request—without any due assessment on its part of his proffered medical proof of his qualifying condition—with a curt written explanation that because he resided off Reservation he was ineligible for an absentee ballot. *See* King Aff.[2] Exhibit A (Election Board rejection letter); and

      c.      Plaintiffs Cross and Hudson respectfully submit that Defendant TBC's regulatory constructed and unstintingly enforced voting requirements constitute proscribed standards, practices or procedures within the meaning of § 2 of the VRA that unfairly and substantially burden their fundamental and undisputed rights to vote, as well as those rights of Cross' fellow non-resident TAT voters, to such an extent as to deny them, both facially and as applied, the equal protection and due process of law.

### B.     Vote Dilution Under Defendant TBC's 1956 Action

      4.      Defendant TBC—pursuant to its installation of the 1956 segment-based system of political representation within the TAT—has permanently and totally excluded Plaintiff Cross, along with his fellow non-resident TAT voters who now comprise between

---

           b.      Hospitalization;
           c.      Attending School where he/she is unable to travel to the Reservation of the day of the election;
           d.      Extreme physical disability where traveling is physically impossible (proof shall be required); or
           e.      Service in the United States Armed Forces

[2] All exhibits and supporting materials are attached to the Affidavit of Lawrence E. King ("King Aff."), filed herewith.

75%-80% of the enrolled TAT membership of some 16,700 individuals, from ever holding **any** (emphasis added) TAT office, nominating **any** (emphasis added) political candidate that reflects his interests or viewpoint and or ever securing **any** (emphasis added) representation whatsoever of his unique political and economic interests on the TBC. *See* TAT Constitution, Article III, Governing Body, Sections 1-6 (As amended by Amendment No.1, effective October 16, 1956).

5.　　The 1956 TBC effectuated its newly  imposed political representational system on Fort Berthold Reservation via its October 16, 1956 sponsored constitutional amendment—that was neither explained to, nor debated by, the affected TAT membership as a whole—that practically established a "tribe within a tribe." This TBC decision introduced two hitherto unknown legal and political concepts within the TAT: (1) **segment-based representation** (emphasis added); and (2) **class-based representational rights** (emphasis added).

6.　　Its first new principle of TAT governance—segment-based representation—locked all future TAT political and economic authority into those six (6) Reservation land parcels that remained after the wrack and ruin that was inflicted on the TAT people by the Garrison Dam and by the inundation of their Reservation under trillions of gallons of waters that were impounded by the 110 mile long flood control reservoir known as Lake Sakakawea.   Its second new principle of TAT governance—class-based TAT representational rights—established two new starkly and distinctively different, but now wholly unequal, classes of TAT membership to replace the hitherto wholly equal and undifferentiated TAT membership: (1) a class of **resident** (emphasis added) TAT members who—by virtue of the 1956 TBC decision—would have full representational

rights that expressly assured them of permanent political and economic dominance on the TAT's governing body; and (2) a class of **non-resident** (emphasis added) TAT members—who by virtue of the 1956 TBC decision—would have absolutely no representational rights within the TAT. Plaintiff Cross—along with his fellow qualified, non-residents TAT voters—are members of class "(2)".

7.      DOI Secretary D'Ewart's[3] 1956 TAT Indian Termination plan for the Fort Berthold Reservation provides the relevant and necessary "totality of the circumstances" context for understanding Defendant TBC's 1986 and 1956 actions that have resulted in Plaintiff Cross' vote denial and vote dilution claims under § 2 of the VRA today. D'Ewart sought to achieve his Indian termination goals and objectives that were imposed upon him and the DOI by the 1953 House Concurrent Resolution (HCR) 108 (Federal Indian Termination Law) via his assertion of administrative financial influence over the TAT governing body from 1951 onward until 1956. He did so in a clear cut attempt to significantly reduce the number of TAT members who would continue—after the federal government's inundation of their Reservation—to reside on the Reservation and for whom the federal government would continue to be responsible for under its judicially imposed

---

[3] D'Ewart, Wesley Abner, a Representative from Montana; born in Worcester, Mass., October 1, 1889; attended the public schools of Worcester, Mass., and Washington State College at Pullman; moved to Wilsall, Park County, Mont., in 1910 and engaged in the Forest Service; stockman, farmer, and businessman in Park County, Mont.; served in the State house of representatives 1937-1939; member of the State senate 1941-1945; elected as a Republican to the Seventy-ninth Congress, by special election, June 5, 1945, to fill the vacancy caused by the death of James F. O'Connor; reelected to the four succeeding Congresses and served from June 5, 1945, to January 3, 1955; was not a candidate for renomination in 1954, but was unsuccessful for election to the United States Senate; assistant to the Secretary of Agriculture, Washington, D.C., from January 1955 to September 1955; assistant secretary, Department of the Interior, from October 1955 to July 1956; special representative to Secretary of Agriculture from August 1956 to October 1958; unsuccessful candidate for the Republican nomination for Governor of Montana in 1960; member, Western States Water Council, 1966-1969; was a director of the National Water Resources Association; resided in Wilsall, Mont.; died in Livingston, Mont., September 2, 1973; interment in Mountain View Cemetery.

Indian wardship duties. The following is a brief excerpt from a 1960 law review article by

the long-time and former Solicitor of the Interior Department, Felix S. Cohen:

> An unpublished study by the Bureau of Ethnic Affairs, of which former [Indian] Commissioner John Collier is President, has already described [the then Indian] Commissioner Myer's [Indian] 'withdrawal' [later formalized in 1953 into DOI's Indian Termination and Urban Indian Relocation programs by Congress' enactment House Concurrent Resolution (HCR) 108] for the [DOI sponsored TAT Termination or] programs for the Indians as 'similar to the authoritarian, racist and stereotyped administration that he directed for the Japanese-Americans in WWII.' In both situations, Commissioner Myer embarked up a [Indian] relocation 'emphasizing resettlement to the exclusion of other considerations and…discouraging directly or indirectly all efforts at community building on the grounds that such would…operate against resettlement.' Ibid. In both situations, an administrator [herein the DOI] has thought he [Secretary D'Ewart] has thought he knows best where other American citizens should live and what they should do and has arranged that the entire force of the government will operate to make the [TAT] people to do what he deems is in their best interests.' Commissioner Myer thus seems intent upon repeating, [on the Fort Berthold Reservation among others], what has aptly been described as 'Our Worst Wartime Mistake'. [quoting Rostow, *Our Worst Wartime Mistake*, 191 Harper Magazine 193 (1945)].

See Felix S. Cohen, *The Erosion of Indian Rights, 1950-1953: A Case Study In Bureaucracy,* 62 Yale Law Journal 348, 390 (1960).

8.     This bargained for exchange between the 1956 TBC and Secretary D'Ewart

came to an end in 1956 as is reflected in a 1956 Senate Report regarding the culmination

of this long struggle between the TAT people who ferociously resisted the federal

government's effort to unilaterally terminate their federally recognized status, on the one

hand, and Secretary D'Ewart's insistence that the DOI would not grant the TAT people

"per cap" access to their $7.5 million in DOI embargoed Congressionally awarded treaty

breach damages for the 1949 Garrison Taking, on the other hand, until and unless the

1956 TBC agreed to the fundamental restructuring of TAT legal and political life on the

Reservation so as to facilitate the DOI's goal of radically de-populating that Reservation

by effectively expelling its youngest, best educated and most vital members by sending them to assertedly new lives and jobs in America's newly burgeoning industrial centers via the BIA's Urban Indian Relocation Program that dated from the mid-1950s to the late 1960s. Here's the relevant portion of the referenced Senate Report that documents Secretary D'Ewart's central role in this process (his name and signature appears on every transmittal letter or other documents that were exchanged between the committee of jurisdiction and the DOI in this process):

> Following the abandonment of the 1951 program and the refusal of the Department [of the Interior] to make per capita distribution of all of the funds, many discussions were held on the drafts of proposed bills which, over a period of years, would give the members of the [TAT] tribe control over the remaining [majority of the] funds and would **terminate** [emphasis added] Federal trusteeship and supervision over their affairs. Complete agreement was not reached on any of these proposed bills, and none was submitted to Congress by the Department.

*Providing For The Segregation Certain Funds Of The Fort Berthold Indians On The Basis Of A Membership Roll For Such Purpose*, S. Report 84-2, Accompanying S.B. 1251, March 9, 1956.

9.      Plaintiffs Cross and Hudson respectfully submit Defendant TBC's 1956 action established standards, practices, or procedures that deny Plaintiff Cross' right of political representation, and therefore, violate § 2 of the VRA and also deprive him of the equal protection and due process of the law.

## II. LAW AND ARGUMENT

**A.      FIRST CLAIM FOR RELIEF:   Defendant TBC's "return to the Reservation to vote" requirement as implemented through its absentee balloting ordinances results in "vote denial" in violation of Section 2 of the Voting Rights Act.**

10.    Plaintiffs are entitled to a declaratory judgment that the 1986 "return the Reservation to vote" requirement as implemented through the TAT's Election Ordinance violates § 2 of the VRA because it results in vote denial.

11.    Section 2 of the VRA prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has either the purpose or result of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  *See Brakebill v. Jaeger*, No. 1:16-CV-008, 2016 WL 7118548 (D.N.D. Aug. 1, 2016) (The District of North Dakota granted relief to Native American plaintiffs for voter disenfranchisement under § 2 of the VRA and the Fourteenth Amendment.).

12.    The United States Supreme Court has long recognized that § 2 of the VRA enforces the constitutional rights of the Fourteenth Amendment of the U.S. Constitution. *See* Daniel P. Tokaji, *Applying Section 2 To The New Vote Denial,* 50 Harv. Civ. R.—C. L. L. Rev. 439, 468-69 (2015) (citing *Harper v. Virginia*, 383 U.S. 661 (1966); *City of Mobile v. Bolden*, 446 U.S. 55 (1980); *Bush v. Gore*, 531 U.S. 98 (2000); *Crawford v. Marion County Elections Board*, 553 U.S., 181 (2008)).  The Fourteenth Amendment provides in relevant part that a government cannot "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction equal protection of the laws."  The Fourteenth Amendment prohibits the imposition of severe burdens on the fundamental right to vote unless they are narrowly drawn to advance a compelling government interest. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

13.     The TBC's 1986 "return to the Reservation to vote" requirement unduly burdens non-resident TAT members' fundamental right to vote in violation of equal protection under the Fourteenth Amendment.

**1.   The "return to the Reservation to vote" requirement burdens non-residents' fundamental right to vote.**

14.     The essence of equal protection is that similarly situated groups are to be treated alike. *City of Cleburne, Tex. v. Cleburne Living Center*, 473, U.S. 432, 440-41 (1985).  When the government distinguishes between two similarly situated groups, the distinctions it makes are subject to scrutiny under an equal protection analysis.  The government may not distinguish solely on differences that are irrelevant to a legitimate government objective. *Reed v. Reed*, 404 U.S. 71, 75-76 (1971).

15.     An equal protection analysis starts with the classification made by the government.  In this case, the "return to the Reservation to vote" requirement creates a distinction between resident and non-resident voters.

16.     Voting is a fundamental right. *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 667 (1966).   "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).  The Equal Protection Clause protects voters against arbitrary and disparate treatment. "The right to vote is protected in more than the initial allocation of the franchise.  Equal protection applies as well to the manner of its exercise.  Having once granted the right to vote on equal terms, the [government] may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 105 (2000); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is

granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause"); *O'Brien v. Skinner*, 414 U.S. 524 (1974).

17.    The propriety of a voting law depends on the extent to which a challenged provision burdens a voters' constitutional rights.  In *Burdick v. Takushi*, 504 U.S. 428, 434 (1992), the court introduced the concept of the sliding scale by which to assess the severity of a burden imposed on voting rights by the government.  On the far left side of the scale there is a slight burden and on the far right side of the scale there is a severe burden.  The *Burdick* Court explained that when voters' "rights are subjected to 'severe' restrictions, the regulation must be narrowly drawn to advance a [government] interest of compelling importance." *Id.* The Court concluded that voting laws that impose a "severe" burden warrant strict scrutiny review.  *Id.*

18.    Statistical evidence and the health and safety concerns during the COVID-19 pandemic indicate the "return to the Reservation to vote" requirement constitutes a severe burden on non-resident TAT voters' fundamental right to vote.

**(a)    Economic Burden**

19.    The economic burden imposed by "the return to the Reservation to vote" requirement is so extreme that it renders off Reservation members' right to vote largely illusory.  Prior to the 1986 "return to the Reservation to vote" amendment, off Reservation voters could vote by absentee ballot with a near zero cost being imposed on them to vote in tribal elections.  Now, after the 1986 amendment, off Reservation voters must pay the real costs associated with traveling to the Reservation to vote in all tribal elections.

20.    Many off Reservation members simply cannot afford to return to the Reservation to vote.  During the 2018 Tribal Elections, there were approximately 10,760

eligible tribal voters.  *See* King Aff. Exhibit B (table with eligible TAT voters by state).  Only 5,824 of those eligible voters resided in North Dakota.  *Id.*  Further, many of the 5,824 members in North Dakota did not reside on the Reservation.

21.     The further the off-Reservation member lives from the Reservation, the more severe "the return to the Reservation to vote" requirement's regulatory burden becomes.  *See* King Aff. Exhibit C (graph of time/travel costs of complying with the "return to the Reservation to vote" requirement imposed by the TBC). The burden imposed on off Reservation members' voting rights ranges from a slight regulatory burden to a severe regulatory burden.  For example, if an off-Reservation member only has to travel 65 miles to a polling site, the "return to the Reservation to vote" requirement imposes only a slight burden.  Alternatively, if an off-Reservation member has to travel 650 miles to a polling site, the "return to the Reservation to vote" requirement imposes a severe burden.

22.     In 2018, a North Dakota State University economist conducted a fiscal analysis on the "return to the Reservation to vote" requirement.  The analysis of travel cost for members of the TAT to return to New Town, North Dakota to vote is conservatively **$1,859,438 per election**.  *See* King Aff. Exhibit D (The analysis is based on (1) 30% voter participation if absentee ballots were available, (2) mileage cost of $.545 per mile, (3) lodging cost of $93 per day, (4) per diem cost of $51, and (5) traveling as many as 600 miles per day.).

23.     The economist's analysis is conservative for several reasons: (1) analysis is based on 30% voter participation; travel cost would be greater if voter participation is higher (30% participation leads to travel cost of $1,859,438; 40% participation leads to travel cost of $2,479,250); (2) analysis does not include impacts such as lost work time

(wages), cost for replacement services (e.g., child or family member care), or use of employment leave time; (3) analysis does not include travel cost for members residing in North Dakota but not on the Reservation; and (4) mileage (distance) is based on direct lines to New Town, North Dakota (mileage is not based on indirect routes of following roads).   The analysis, however, needs to adjust the impact to reflect the cost of administering absentee ballots, but this adjustment would be a minor dollar amount. Accordingly, the fiscal impact of the "return to the Reservation to vote" requirement is enormous.

    **(b)**    **Health and Safety During COVID-19 Pandemic**

24.    The "return to the Reservation to vote" requirement burdens non-resident members health and safety.   The effect of the "return to the Reservation to vote" requirement is that non-residents like Plaintiff Cross must choose between relinquishing their guaranteed right to vote or travel to the Reservation to vote—thereby risking their either contracting the COVID-19 virus or of their possibly infecting other medically vulnerable TAT members.   This choice constitutes a severe burden on non-resident TAT members' right to vote.

    **2. The "return to the Reservation to vote" requirement as implemented through the TAT Election Ordinance's absentee balloting provisions does not serve a compelling government interest.**

25.    Since the "return to the Reservation to vote" requirement and its implementation via the TAT Election Ordinance severely burdens the fundamental right to vote, the requirement and its implementing legislation must be narrowly tailored to serve a compelling [government] interest in order to withstand scrutiny. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) ("[A]s we have recognized when [Fourteenth

Amendment] rights are subjected to 'severe' restrictions, the regulation must be narrowly drawn to advance a [government] interest of compelling importance."); *Reynolds*, 377 U.S. at 562 ("Since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.").

26.     The TBC has failed to provide any justification for denying absentee ballots to non-resident TAT voters.  That is likely because there can be no government interest compelling enough to justify abridging 75% of the TAT's eligible voters' right to vote. The "return to the Reservation to vote" requirement and its implementation by the TBC results in disparate treatment and imposes a severe burden on non-resident TAT members' fundamental right to vote, and because the TBC has not offered any justification for the burden, the "return to the Reservation to vote requirement" cannot survive an equal protection strict scrutiny analysis.  As such, the "return to the Reservation to vote" requirement as implemented through the TAT Election Ordinance, violates non-residents' right to equal protection and due process under the Fourteenth Amendment. Consequently, because § 2 of the VRA enforces the constitutional rights of the Fourteenth Amendment, the "return to the Reservation to vote" requirement and its implementation through Defendant TBC's Election Ordinance violates § 2 of the VRA.

**B.     SECOND CLAIM FOR RELIEF:  Defendant TBC's decision installing its "segment based" representational system on the Fort Berthold Reservation has resulted in the total exclusion of Plaintiff Cross, and his fellow non-resident TAT voters, from ever holding office within the TAT, from ever nominating a candidate of his or their choice to serve on the TBC or from ever having any voice in the financial or economic decision making within the TAT, all in violation of Section 2 of the VRA's prohibition of representational standards, practices or procedures that deny an identifiable group or class of otherwise eligible voters the equal protection and due process of law.**

14

27.    Plaintiffs are entitled to a declaratory judgment that Defendant TBC's two distinctive decisions in 1956 and 1986, that are nonetheless historically and legally inter-linked,  represent and constitute prohibited practices of vote denial and vote dilution in violation of § 2 of the 1965 Voting Rights Act ("VRA") because these two systemically interrelated decisions sought to accomplish the following prohibited ends: 1. its 1956 decision—that was reviewed and approved by Secretary Wesley A. D'Ewart of the DOI pursuant to his duties and obligations thereto under Section 16 of the IRA—establishing a segment-based system of political governance on Fort Berthold Reservation—birthed out of its Termination-era collaboration with Secretary D'Ewart—expressly created two new and distinctive groups of TAT members,  one group (residents of the Reservation) that was and is highly politically and economically advantaged and one group (non-residents of the Reservation) that was and is highly politically and economically disadvantaged (See TAT Constitution, Article III, Governing Body, Sections 1-6, Amendment No. 1, October 16, 1956); and 2. its 1986 decision—wherein it independently chose to 'double down' on its earlier 1956 decision by acting to strengthen the advantage of its favored group of TAT members (residents) and conversely, by acting to deepen the disadvantage of its disfavored group of TAT members (non-residents)—that now requires all non-resident TAT voters, including Plaintiff Cross, to return to the Reservation to vote regardless of their personal circumstances that make it practically impossible for him and many of them to comply with that requirement.

28.    Defendant TBC's two standards or procedures setting actions of political exclusion—one in 1956 and one in 1986, are historically and legally interrelated and are enforced today—present actionable statutory claims for vote denial and vote dilution

under § 2 of the VRA.  *See* Daniel P. Tokaji, *Applying Section 2 To The New Vote Denial,* 50 Harv. Civ. R.—C. L. L. Rev. 439, 440 (2015); *Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006) (for the proposition that vote dilution cases may be brought by Native Americans under § 2 of the VRA).

29.    Defendant TBC's 1956 action—that was reviewed and approved by Secretary D'Ewart consistent with the DOI's Indian Termination goals and objectives that were imposed on it by HCR 108 (the Indian Termination Law)—constitutes vote dilution because it thereby instituted a discriminatory political exclusion procedure or practice that, today, intentionally excludes 75%-80% of the enrolled TAT membership form ever participating in TAT political governance on the Fort Berthold Reservation.  It did so by its establishment of two new groups of TAT members as follows:  A.  one group of enrolled tribal Indians who reside on the Reservation; and B. one group of enrolled tribal Indians who reside off the Reservation.  *See* TAT Constitution, Article II, Governing Body, Sections 1-6, Amendment No. 1, October 16, 1956.  **Only** (emphasis added) tribal Indians in Group "A" may **hold** (emphasis added) TAT office, **nominate** (emphasis added) candidates to the TBC and practically **vote** (emphasis added) the segment candidate of their choice to represent them on the governing TAT body, the TBC.  By contrast, the tribal Indians in Group "B" can **never** (emphasis added) hold office in the TAT, nominate the segment-based candidate of their choice to represent them in public office, or practically vote for the segment-based candidate of their choice that will sit on the TBC.

30.    Defendant TBC's 1986 action—done independently and without any evidence of DOI's threat of economic or political coercion as was the case in 1956— nonetheless, built upon its 1956 action so as to impose additional discriminatory practices

16

or standards of political exclusion upon those tribal Indians within Group "B" (non-residents of the Reservation) by: a. expressly burdening their fundamental right to vote in TAT elections by expressly requiring them—including Plaintiff Cross—to return—regardless of their personal circumstances such as their advanced age, the great distances they would have to travel, their extreme physical disability or their poverty that makes it practically impossible for them to comply with this TBC imposed requirement—to the Reservation to vote in person at their assigned Reservation polling site; and b. locking-in Group "B" tribal Indians into a "once and done" fictional segment voting selection that is forever "binding upon such non-resident [tribal Indian] voter in subsequent elections" even though such a voter may much prefer another segment candidate who would better represent his or her interest on the TBC.  *See* TAT Constitution, Article IV, Nominations and Elections, Section 2(b) (As amended by Amendment XI, effective July 2, 1986).

31.    Defendant TBC's  inter-acting and inter-related 1956 and 1986 actions clearly meet § 2(b)'s "totality of the circumstances" test, given that their prohibited practices, procedures or standards  have been consistently maintained and enforced by Defendant's coercive means and tactics for over 64 years.  Indeed, Defendant TBC's actions capture the quintessence of Senator Bob Dole's noteworthy language of his famous 1982 compromise that lead to the enactment of that particular section of the VRA:

> A violation of Section 2 is established, if based on the totality of the circumstances, if it is shown that the **political processes leading to nomination or election in the [Three Affiliated Tribes]…are not equally open to participation by members of a class of [TAT] citizens protected [by Section 2] in that its [non-resident TAT] members have less opportunity than [resident TAT] members of the [TAT] electorate to participate in the [TAT] political process and to elect [TAT] representatives of their choice.**

42 U.S.C. § 1973(b) (2012) (emphasis added).

32.     The relevant "totality of the circumstances" clearly demonstrate that Defendant TBC's two inter-linked actions—historically and legally interconnected from 1956 and 1986, as well as being ferociously enforced by Defendant today—constitute prohibited voting "practices, procedures or standards" within the meaning § 2 of the VRA. Moreover, Defendant TBC's long maintained participatory policies also meet the "but for" statutorily required causal link in that its practices and procedures are directly related to Plaintiffs' loss of their specific and identifiable participatory and electoral opportunities, that they—and their fellow non-resident TAT voters—would otherwise have available to them as equal members of the TAT, **but for** (emphasis added) Defendant TBC's willful and purposive elimination of those electoral opportunities.  *See Veasey v. Abbott,* 830 F.3d 216, 245 (5th Cir. 2016) (explaining the factors "used to help determine whether there is a sufficient causal link between the disparate burden imposed and social and historical conditions produced by discrimination."); *Ortiz v. City of Philadelphia Office of the City Comm'rs*, 28 F.3d 306, 312 (3d Cir. 1994) ("Section 2 plaintiffs must show a causal connection between the challenged voting practice and [a] prohibited discriminatory result.").

33.     The reigning judicial test for vote dilution and denial under § 2 is that articulated by the Sixth Circuit in *Ohio State Conference of the N.A.A.C.P. v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014).  The U.S. Supreme Court stayed that decision for 90 days in *Husted v. Ohio State Conf. of N.A.A.C.P*, 573 U.S. 988 (2014).  The Sixth Circuit held:

> [T]wo elements must be satisfied for a plaintiff's § 2 vote denial claim to succeed: 1. 'the challenged 'standard, practice or procedure' must impose a discriminatory burden on members of a protected class (herein an

ethnically identifiable group of tribal Indians) meaning that members of [that] protected class have 'have less opportunity than other members of the electorate to participate and to elect representatives of their choice', and 2. 'that burden must in part be caused by or linked to 'social and historical conditions' [such as the overt economic pressure applied by that Termination-era minded Secretary D'Ewart to the 1956 TBC to enact segment-based political representation on the Fort Berthold Reservation] that have or currently produce discrimination against members of the protected class [as is demonstrated by the 1986 TBC's decision to 'double down' on its earlier discrimination by  its independent enactment of its 'return to the Reservation to vote' requirement].

*See* Tokaji at 464.

34.    The U.S. Supreme Court's 90 day stay of the Sixth Circuit's injunction order in the *Husted* matter effectively mooted that court's decision.  Because the stay lasted 90 days and the Sixth Circuit's injunction applied only to the then-imminent 2014 election, the Sixth Circuit's injunction became moot at the moment the U.S. Supreme Court issued the stay order.  *See Husted v. Ohio State Conf. of N.A.A.C.P*, 573 U.S. 988 (2014).  The Sixth Circuit then vacated its own decision as such.  *See Ohio State Conference of the N.A.A.C.P. v. Husted*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014).

35.    However, the Sixth Circuit's two-part test has, nonetheless, lived on:

But the two-part test for Section 2 vote denial liability lived on. Later that year, the Fourth Circuit 'agree[d]' with the Sixth Circuit's two-part test, and adopted it word-for-word, in a decision enjoining various voting restrictions in the North Carolina litigation.  Meanwhile, the Seventh Circuit issued a decision upholding Wisconsin's voter ID law, but noted its 'agree[ment]' with the Sixth Circuit's two part test. Two years later, in the run-up to the 2016 general election, the en banc Fifth Circuit adopted the two-part test in striking down Texas' strict voter ID law.  The Sixth Circuit also readopted the test in a series of decisions—first, a motions panel decision that declined to stay an injunction against Michigan's elimination of straight-ticket voting, and later a merits panel decision upholding the remaining early voting cutbacks in Ohio. And finally the Ninth Circuit adopted the same test in a decision granting an injunction pending appeal against an Arizona law that 'criminalize[d] the collection, by persons other than the voter, of legitimately cast [absentee] ballots.

*See* Dale E. Ho, *Building An Umbrella In A Rainstorm: The New Vote Denial Litigation Since Shelby County*, 127 Yale L. J. F. 799, 807 (2018) (citing *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014); *Veasey v. Abbott,* 830 F.3d 216 (5th Cir. 2016); *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014); and *Feldman v. Ariz Sec'y of States Office*, 843 F.3d 366 (9th Cir. 2016)).

36.     Plaintiff Cross easily meets the "results" language of § 2(b) of the VRA given his "express disenfranchisement" and political exclusion from any future possible role in political governance of the Fort Berthold Reservation.  *See Chisom v. Roemer*, 501 U.S. 380, 394 (1991) ("[P]laintiffs can prevail under § 2 by demonstrating that a challenged election practices has *resulted* in the denial or abridgment of the right to vote based on color or race."). The stark character of Defendant TBC's actions are laid bare by a brief analysis of the Ninth Circuit's 1997 decision in *Smith v. Salt River Project Agricultural Improvement & Power District*, 109 F.3d 586 (9th Cir. 1997) wherein that court upheld a property qualification to vote known as "one acre, one vote." That court found that there was "no claim that the [irrigation] District's voting system discriminates against *non-landowners* (non-voters) (italics in original text)." *Salt River*, 109 F. 3d. at 594.  But in Plaintiff Cross' case the **only** (emphasis added) explanatory rationale—absent any valid property owner or other justifiable standard for voting in an irrigation district—for Defendant TBC's vote denial actions in 1956 and 1986, as well as today, is to discriminate against an otherwise ostensibly equal group of tribal Indians—an ethnically identifiable tribal group that's otherwise indistinguishable from that other politically and economically advantaged group of tribal members—except for the fact that they have been denied the right to vote and to political representation within the TAT, while the other group has not.

37.     Section 2 "also explicitly prohibit[s] the *abridgement* (italics in original) of the right to vote," which includes practices that make it more burdensome to vote. *Veasey v. Abbott*, 830 F.3d 216, 253 (5th Cir. 2016). The 1986 Defendant TBC's decision to both end the non-resident TAT voters' right to vote by absentee ballot and to require them to "return to the Reservation to vote," regardless of **any** (emphasis added) personal circumstance such as Cross' extreme physical disability that practically prevents him from complying with this requirement, clearly burdens his fundamental and undisputed right to vote in all TAT elections. Furthermore, as Justice Scalia once observed, "[i]f a county permitted voter registration for only three hours one day a week, and that made it *more difficult* (italics in original) for blacks to register than whites, [then] blacks would have less opportunity "*to participate* (italics in original) in the political process than whites, and § 2 would therefore be violated."  *See* Ho at 811.

38.     Felons are accorded the right to assert their voter disenfranchisement claims under § 2 of the VRA. *See Farrakhan v. Gregoire*, 623 F.3d 990 (9th Cir. 2010) (*en banc).* The *en banc* Court held that these laws have an "affirmative sanction" in the Fourteenth Amendment which expressly excludes disenfranchisement for "participation in a rebellion, *or other crime.*"  *Id.* at 993 (italics in original).  Given that Plaintiffs Cross and Hudson are not felons—and that most if not all, of Cross' fellow non-resident TAT members are not felons, as well—then there doesn't seem to be any express constitutional warrant for Defendant TBC's twin disenfranchisement actions in 1956 and 1986.

39.     Furthermore, the Ninth Circuit's 2012 *en banc* decision held that there must be a "searching practical evaluation of past and present reality" as well as an "intensely

21

fact-based and localized" inquiry into the facts of each particular § 2 case. *See Gonzales v. Arizona*, 677 F.3d 383, 406 (9th Cir. 2012) (*en banc*).  Applying that sort of inquiry to the facts at hand in Plaintiffs' case against Defendant TBC simply reveals what we know already to be true: Defendant TBC's 1956 and 1986 actions, coupled with its present day on-going and stringent enforcement of its prior voting practices, standards or procedures: 1. Impose a disparate impact on the voting and representational rights of an ethnically distinct and protected group of tribal Indians—including Plaintiff Cross; and 2. the challenged voting and representational standards and practices interact with the relevant historical and social conditions so as to systemically diminish Plaintiffs' and their fellow non-resident TAT members' opportunities to participate in the political process. *See* Tokaji at 455.

40.     The 1956 TBC established segment-based political representation system on Fort Berthold does bear some superficial resemblance to the "special irrigation/voting district"—a system of "one acre, one vote" versus a  system of "one segment, one TBC representative"—that was upheld by the Ninth Circuit court in its 1997 *Smith* decision. *See Smith v. Salt River Project Agricultural Improvement & Power District*, 109 F.3d at 586 (Court held that the District was entitled to allocate voting rights on a "one acre, one vote" basis as long as it didn't actively discriminate against non-voters and or non-landowners). However, the 1956 TBC decision, and its co-joined 1986 decision, does **actively discriminate** (emphasis added) against formally co-equal TAT members—including the Plaintiffs—who are: 1. TAT voters,  not non-voters; and 2. who are equal owners, not non-owners, of the TAT people's monies and assets that the TBC presently exercises unchecked redistributive authority over pursuant to TAT Constitution, Article VI,

Powers, Section 5. [The TBC is to be distinguished from a "special district" entity which is typically an inferior governmental arm that is established solely to perform a single service, while the TBC is a multi-purpose governmental entity that is federally recognized as  a body that that has the power to promulgate and enforce general rules of behavior]. If these had been the facts in *Smith,* Plaintiffs assert that the likely decisional outcome in that matter would have been quite different.  While the U.S. Supreme Court in its 1969 *Avery* decision did recognize a narrow "special interest exception" to the generally governing equal protection rules of political participation, there is no defensible and justifiable governmental rationale, as there was in *Smith*, for the 1956 and 1986 TBC "apportion[ing]" political representation within the TAT as it did. *See also Ball v. James*, 451 U.S. 355 (1981); *Sayler Land Co. v. Tulare Lake Basin Water Storage District*, 410 U.S. 719 (1973); and *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60 (1978).  Plaintiffs respectfully submit, based on the foregoing, that Defendant TBC has violated Plaintiffs' statutorily conferred voting rights under § 2 of the VRA.

41.    Furthermore, and unlike the non-landowner plaintiffs in the Ninth Circuit's *Smith* decision, Plaintiffs Cross and Hudson have both a direct political and economic stake in the decisions made by Defendant TBC.  First, the TAT people have expressly delegated to Defendant TBC the coercive power to manage and redistribute the TAT people's—including Plaintiffs Cross and Hudson as well as those 75%-80% of  enrolled TAT members who live and work off Reservation—monies and assets. *See* Article VI, Powers, Section 5, TAT Constitution.  Second, Defendant TBC has, in fact, exercised its coercive and redistributive powers over **all** (emphasis added) the TAT people's monies and assets by re-distributing virtually all of those equally owned TAT monies to a small

minority (approximately 2,200 members who reside on Reservation versus the 14,500 TAT members who reside off Reservation) of TAT members who reside within the Reservation's six (6) political districts or segments of the Reservation. This fact of the unequal distribution by Defendant TBC of the TAT people's monies is corroborated by the following two paragraphs that are taken from the recent 'charging affidavits' that have been filed by the FBI in connection with the indictment of several present and former TBC members and high level TAT employees for alleged felony offenses committed under the bribery sections of the Indian Major Crimes Act ("IMCA") (This information is offered only for the limited purpose of documenting Defendant TBC's actions with regards to the TAT people's monies and is not intended to express any opinion with respect to the ultimate guilt or innocence of the named, charged parties.).

> The FBIR [Fort Berthold Indian Reservation], which is the home of the MHA Nation is divided into six segments: the West Segment, the North Segment, the Four Bears Segment, the Parshall Segment, the White Shield Segment, and the Twin Buttes Segment. Each segment elects one representative on the MHA Nation Tribal Business Council (TBC), the governing body of the TAT. A seventh seat is held by the MHA Nation's elected Chairman. Funding requests, budget approval, legislative matters, and special projects approvals all fall under the purview of the TBC. In all years relevant to this complaint, the MHA Nation received in excess of $10,000 [sic] in federal benefits through programs of the United States Government.

*U.S.A. v. Randall Jude Phelan*, United States District Court for the District of North Dakota, Case No. 1:20-mj-337, *Criminal Complaint*, ¶ 4.

> Each segment receives an annual, multi-million dollar allocation of funds from the TAT General Fund. Many segments, including the West Segment, deposit this allocation into the segment's economic development corporation (EDC) account. Expenditures from a segment's allocation are not subject to TBC oversight, and the TBC representative has significant discretion as to the spending of the segment's allocation.

*Id.* at ¶ 5.

### C. THIRD CLAIM FOR RELIEF: Injunctive Relief

24

42.     Plaintiffs are entitled to injunctive relief prohibiting enforcement of the "return to the Reservation to vote" requirement and ordering an absentee balloting process whereby all non-resident, enrolled TAT members, eighteen (18) years of age or older, are to be afforded an opportunity to vote by absentee or mail-in ballot in the 2020 TAT primary and general elections of the Fort Berthold Reservation.

43.     In order to secure a preliminary injunction, Plaintiffs must establish (1) substantial probability of succeeding on the merits, (2) irreparable injury, (3) the injury outweighs any potential harm on other parties, and (4) effect on the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F. 2d 109, 113 (8th Cir. 1981).   The   factors indicate that injunctive relief is warranted.

### 1.     Success on the Merits

44.     Defendant TBC has denied and diluted both  Plaintiff Cross' right to vote and his right to fair and equal representation within the TAT by its imposition of standards, practices and procedures that are prohibited by § 2 of the VRA and Defendant continues, today, to enforce those proscribed standards to such an extent as to deny Cross the due process and equal protection of the law.  First, Defendant TBC sponsored a 1986 TAT Constitutional amendment that requires Cross—as well as his fellow eligible, non-resident TAT voters—to "return to the Reservation to vote" regardless of Cross' extreme physical disability that makes it virtually impossible for him to travel the 1500 mile, one-way, distance from his residence in Tucson, AZ to the Reservation. *See* TAT Constitution, Article IV, Section 2(b); TAT Election Ordinance TAT Election Ordinance, Chapter 1, Section 3(B).  Consequently, Defendant TBC's mandated and stringently enforced voting requirement imposes a severe and unjustified burden on Cross' exercise of his

undisputed and fundamental right to vote—as well as unduly burdening the fundamental voting rights of his fellow non-resident, eligible TAT voters—in all TAT elections to such an extent as to deny him the equal protection and due process of law. Second, Defendant TBC sponsored, and enforces today, a 1956 TAT Constitutional amendment that imposed a new representational system of governance—known as segment-based representation—within the TAT that forever excludes Plaintiff Cross—and his fellow non-resident, eligible TAT voters—from ever **holding** (emphasis added) office within the TAT, from ever **nominating** (emphasis added) candidates of his/their choice and/or from ever securing **representation** (emphasis added) on the TAT governing body, so as to, both facially and as applied, deny Cross the equal protection and due process of law. *See* TAT Constitution, Article III, Governing Body, Sections 1-6, Amendment No. 1, October 16, 1956).  Given these legal factors and principles, Plaintiffs are likely to prevail on the merits of their case.  *See Brakebill v. Jaeger*, No. 1:16-CV-008, 2016 WL 7118548 (D.N.D. Aug. 1, 2016).

### 2.      Plaintiffs are Irreparably Injured and the Injury Outweighs any Harm

45.      In *Reynold v. Sims*, 377 U.S. 533, 562 (1964), the Court held that "the right to exercise [the voting right] franchise in a free and unimpaired manner is preservative of [all] other basic civil and political rights" and the right to vote is a "fundamental right".

46.      Although the showing of irreparable harm is otherwise an essential element to obtaining injunctive relief, most federal circuit courts have held that irreparable injury *must be presumed* in any case that involves a plaintiff's *bona fide* assertion of a fundamental right. 11A Wright & A. Miller, *Fed. Prac. & Proc. Civ.* § 2948.1 (2020) ("When an alleged deprivation of a [fundamental] constitutional right is involved . . . most courts

hold that no further showing of irreparable injury is necessary."); See *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.,* 540 F.3d 752, 762 (8th Cir 2008*); Chaplaincy v. Full Gospel Churches v. England*, 454 F.3d 290, 299-304 (D.C. Cir. 2006).  Defendant TBC's 1986 and 1956 voting and representational rights actions—read together as representing the "totality of the circumstances" of these two legally and historically inter-linked TAT voting and representational practices, standards or procedures as is required by § 2(b) of the VRA—sufficiently demonstrate that Plaintiffs will continue to suffer irreparable harm from the disparate and unequal impact of the actions that deny them the equal protection and due process of law. *See Ohio State Conference of the N.A.A.C.P. v. Husted*, 768 F.3d 524 (6th Cir. 2014); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244-48 (4th Cir. 2014).

47.    Defendant TBC has no legally cognizable interest or right to protect  in continuing to maintain and enforce its 1986 and 1956 voting and representational practices, standards or procedures—absent its showing of a compelling governmental interest in so doing—that, both facially and as applied, violate § 2 of the VRA and deny Plaintiff Cross—along with his fellow non-resident, eligible TAT voters—the equal protection and due process of law.

### 3.    Public Interest

48.    The public is best served by both preserving the public health of TAT members and by competitive races for public office.  There is no public interest in denying a ballot to an eligible voter.  It is always in the public interest to prevent violations of individuals' constitutional rights. *Deerfield Med. Ctr. V. City of Deerfield Beach,* 661 F.2d 328, 338-39 (5th Cir. Unit B Nov. 1981); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006. 1029

(9th Cir. 2013).   Furthermore, the government has no interest in enforcing an unconstitutional law.  *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d. Cir. 2013). If non-resident members are not given the opportunity to vote by absentee ballot in the 2020 general election, 75% of the TAT membership will not have a voice in their own government for years to come.  Injunctive relief will serve the public interest because it will prevent violation of non-residents' constitutional rights and will prevent additional cases of a deadly infectious disease.   Plaintiffs clearly meet all the requirements necessary for a preliminary injunction.

49.   The Plaintiffs will be unable to secure the relief they need and deserve in this voting rights case unless this federal court enforces § 2 of the VRA.   No one else– definitely not the BIA/DOI—will intervene in this TAT voting rights case, but for the federal court under § 2 of the VRA.  "The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to [the VRA] and shall exercise the same without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law."  52 U.S.C. § 10101(d). By authorizing lawsuits under the VRA, Congress has acted as the people's representatives in determining that judicial enforcement of the VRA is appropriate and necessary when violations occur. For far too many years, Defendant TBC has denied and diluted non-resident TAT members' voting rights.  "When the Court perceives commonly-shared harms as substantial and susceptible to evading redress because the executive has failed to act, it may hear them." Kimberly N. Brown, *Justiciable Generalized Grievances*, 68 Md. L. Rev. 221, 278 (2008). Simply stated, this Court's enforcement § 2 of the VRA is the only avenue whereby Plaintiffs can secure the relief they need and deserve.

## III.      CONCLUSION

50.     Plaintiffs respectfully request that the Court grant their Motion for Declaratory and Injunctive Relief by issuing the following relief:

**1.      For declaratory relief pursuant to § 2 of the VRA decreeing that:**

### VOTE DENIAL

A.      Defendant TBC's 1986 promulgated "return to the Reservation to vote" requirement constitutes "vote denial" via a prohibited voting practice, procedure or standard within the meaning of § 2 of the VRA and, therefore, violates, both facially and as applied, Plaintiffs' rights to the equal protection and due process of law (TAT Constitution, Article IV, Section 2(b) and TBC Election Ordinance, Chap. I, Section 3(b) and Chap. VI, Section 1(A)(1)(a-e)); and

### VOTE DILUTOIN

B.      Defendant TBC's 1956 promulgated "segment based" system of political representation on Fort Berthold Reservation—whereby between 3/4 to 4/5 of the hitherto wholly equal TAT members, including Plaintiff Cross, have been forever stripped of their fundamental political rights to **hold** (emphasis added) office in the TAT, **nominate** (emphasis added) candidates of their choice or to secure **representation** (emphasis added) on the TAT governing body—constitutes "vote dilution" via a prohibited representational practice, procedure or standard within the meaning of § 2 of the VRA and, therefore, violates, both facially and as applied, Plaintiffs' right to the equal protection and due process of law. (TAT Constitution, Article III, Governing Body, Sections 1-6 (As amended by Amendment No. 1, effective October 16, 1956)).

**2.      For the following equitable order in the form of injunctive relief:**

29

A.      That a Special Master be appointed pursuant Fed. R. Civ. P. 53 to oversee:

(1)      the administration of a mail-in balloting process for the scheduled 2020 TAT General Election  whereby all enrolled, eligible (18 years of age or older), non-resident TAT members are afforded a timely and reasonable opportunity to vote by mail-in ballot in the 2020 General TAT Elections; and

(2)       the development and promulgation by the 2022 TAT elections, and as ratified by a TAT member-wide referendum election, of a fair and equal representational system establishing Fort Berthold Reservation as a single electoral district with seven (7) 'at large' elected TAT representatives (six (6) Council members and one (1) Chair) who will represent all TAT members.

B.      The Special Master shall take all appropriate, reasonable and prudent steps to ensure with respect to items (1) and (2) of his above assigned duties and responsibilities that:

## VOTE DENIAL

(1)      The TEB develops an intelligible and plainly written primary and general election ballot for use by an average non-resident TAT voter, subject to the review and approval of the Special Master;

(2)      The TEB develops and/or prepares an updated and accurate list of the names, addresses, and phone numbers and/or emails of all enrolled, non-resident TAT members, subject to the review of the Special Master, who are eighteen (18) years of age or older and who are, therefore, presumptively entitled to vote in the 2020 general election;

(3)     The TEB develops and/or prepares a timely and reasonable schedule, subject to the review of the Special Master, for the actual "mailing out" of the 2020 general election ballot to the enrolled, non-resident TAT voters so that they will be allowed at least two (2) weeks, after their expected receipt of their ballots, in which to consider their electoral choices or options, prior to their choosing their preferred candidate(s) for tribal office and returning their marked and signed ballot(s) in the stamped postage paid, self addressed to the TEB, return mailer;

(4)     The TEB develops and/or prepares a brief, intelligible, and clear instructional letter that is directly addressed to "Dear non-resident TAT voter" and that reassures him or her that he/she has the right to vote in the 2020 general TAT election by completing the enclosed ballot as instructed, by clearly marking or indicating the candidate(s) of his or her choice, by signing the ballot and returning it in the enclosed postage paid, self-addressed mailer on or before the posted dated of the particular election (primary or general) involved;

(5)     The TEB develops and/or prepares a regulatory process for the safe and controlled receipt and storage of all absentee or mail in ballots that are cast by non-resident TAT voters in the TAT 2020 general election; furthermore, that process design standards, requisite security protocols, as well as the identity, requisite qualifications, as well as those specifically assigned duties and responsibilities of those assigned TEB officials and/or staff who may be entrusted with receiving, processing, and storage of the ballots, shall be subject to the review of the Special Master;

(6)     The TEB develops and/or prepares a regulatory process, subject to the review of the Special Master, for the opening and counting of all the secured ballots that

31

have been cast by the enrolled, adult non-resident TAT voters in the 2020 general election; and opening and counting of said ballots by any officials and staff of the TEB **shall** only take place in the presence of the Special Master or his designee;

(7)     The TEB develops and/or prepares a regulatory process, subject to the review of the Special Master, for the identification and segregation of any and all ballots that are cast by non-resident, adult TAT members that are alleged by the TEB to be invalid because of (a) the receipt of said ballot was not postmarked on or before the date of the 2020 TAT general election as the case may be; (b) the said ballot was not signed by the specific and affected non-resident, adult TAT voter involved; (c) the said ballot of a specific and identified non-resident TAT voter was deemed spoiled by the TEB due to mismarking the said ballot; or (d) other alleged material deviations from established TEB balloting standards; and

(8)     The TEB develops and/or prepares an unofficial tally and count, subject to review and approval of the Special Master, of the those ballots that were cast and for which specific candidate(s) those ballots were so cast, by the non-resident, adult TAT voters in the 2020 TAT general election; and the Special Master, upon the completion of his review and approval, of those TEB tallies and counts as consistent with and reflective of actual, expressed will and intent of those ballots that were cast by the non-resident, adult TAT voters, *in toto*, shall prepare and certify a final count and report of the results of that balloting process in the 2020 general TAT elections.

## VOTE DILUTION

C.     With respect to Plaintiffs' vote dilution claims:

(1)     The Special Master shall review and assess alternative representational plans or models for structuring a fair and equal representational system on the Fort Berthold Reservation;

(2)     He shall inform the present TBC incumbents and the newly elected three (3) TBC representatives that they shall be allowed to serve out their constitutionally defined terms as the "interim government" of the TAT;

(3)     He shall develop an appropriate and fair representational system on Fort Berthold via consultation with interested parties such as the BIA/DOI and leading experts in political representation theory and practice;

(4)     He shall require Defendant TBC to submit any proposed voting rights change to him for approval under § 3 of the VRA;

(5)     He shall order an audit of the present financial health and status of the TAT pursuant to Section 9 of the TAT Corporate Charter and his delegated equitable powers of the Court;

(6)     He shall consider the advisability of entering a "stand still" order whereby the interim tribal government is prohibited from expending TAT monies and funds over an above defined amount without his express approval to do so; and

(7)     He shall arrange, supervise and conduct a TAT member wide referendum election wherein the majority vote of the eligible TAT members actually voting shall be binding and validate the election regarding the adoption of his proposed representational plan in consultation and/or cooperation with the BIA/DOI at least six (6) months before the 2022 TAT primary and general elections.

Respectfully submitted this 29th day of September, 2020.

ZUGER KIRMIS & SMITH, PLLP
Attorneys for Plaintiffs
PO Box 1695
Bismarck, ND 58502-1695
701-223-2711
lking@zkslaw.com
dpathroff@zkslaw.com

By: _____
Lawrence E. King   ID#04997
Dennis Pathroff     ID#08607