**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| Raymond Cross and Marilyn Hudson,<br><br>                   Plaintiffs,<br><br>vs.<br><br>Mark Fox, Randy Phelan, Fred Fox, Mervin Packineau, Judy Brugh, Cory Spotted Bear, and Monica Mayer, individually and as members of the Three Affiliated Tribes Tribal Business Council,<br><br>                   Defendants. | Case No. 1:20-CV-00177 |

---

**ORDER GRANTING MOTION TO DISMISS**

---

[¶1]       THIS MATTER comes before the Court on a Motion for a Preliminary Injunction filed by the Plaintiff's on September 29, 2020. Doc. Nos. 5, 9. The Defendants also filed a Motion to Dismiss for Lack of Jurisdiction on October 26, 2020.[1] Doc. No. 20.  For the reasons set forth below the Defendant's Motion to Dismiss is **GRANTED** and the Plaintiff's Complaint is **DISMISSED without prejudice**.  The Plaintiff's Motion for Declaratory Judgment and Injunctive Relief, Motion Requesting Oral Argument, and Motion for a Preliminary Injunction are **DENIED AS MOOT**.

---

[1] Parties are permitted twenty-one (21) days to respond to a motion to dismiss under Local Rule 7.1(A)(1), D.N.D.Civ.L.R. However, because the jurisdictional question here has only one clear answer and the parties need an answer in time to vote, this Court is rendering a decision without allowing the Plaintiff the time to respond.

## BACKGROUND

[¶2]      Plaintiffs Raymond Cross ("Cross") and Marilyn Hudson ("Hudson") initiated this action on September 29, 2020 by filing a complaint. Doc. No. 1. Plaintiffs also filed a Motion for Declaratory Judgment and Injunctive Relief, Motion Requesting Oral Argument, and a Motion for a Preliminary Injunction on September 29, 2020. Doc. Nos. 5, 8, 9.

[¶3]      Both Plaintiffs are enrolled members of the Three Affiliated Tribes ("TAT"). Doc. No. 1. at ¶20. Three Affiliated Tribes are the Mandan, Hidatsa, and Arikara, or MHA Nation. Cross resides off the reservation and is a resident of Tucson, Arizona. Id. at ¶21. Cross notes he was diagnosed with a malignant spinal tumor in 2015, is severely limited in his mobility, and has little or no feeling in his lower extremities. Id. Hudson resides on the reservation and is a resident of Parshall, North Dakota. Id. at ¶22. She also contends she has several health ailments. Id. Plaintiffs take issue with the 'return to the reservation to vote requirement' for non-residents, while permitting residents of the reservation to obtain absentee ballots. Id. at ¶3. The Plaintiffs allege the Defendants, individually and as members of the Three Affiliated Tribes Tribal Business Council, have "impermissibly burden[ed]" their rights by burdening their ability to vote, hold office, nominate a political candidate, or "secure representation" on the Three Affiliated Tribes governing body. Id. at p. 2. Plaintiffs allege this is in violation of the Indian Civil Rights Act ("ICRA") and the Voting Rights Act ("VRA").

[¶4]      Defendants filed a Motion to Dismiss for Lack of Jurisdiction on October 26, 2020. Doc. No. 20. Defendants contend this Court lacks subject matter jurisdiction, sovereign immunity divests this Court of jurisdiction, and tribal remedies must be exhausted.

## ANALYSIS AND LEGAL DISCUSSION

### I.     STANDARDS

#### a.  Exhaustion of Tribal Remedies for ICRA Due Process and Equal Protection Claims

[¶5]     Before the Court may address a motion for a preliminary injunction, the Court must be satisfied it has jurisdiction over the matter.   "Federal courts are courts of limited jurisdiction." Myers v. Richland County, 429 F.3d 740, 745 (8th Cir. 2005). The burden of establishing a federal court's jurisdiction rests upon the party asserting jurisdiction.  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Because the majority of the Plaintiffs' arguments are based on the ICRA and VRA, the Court will not engage in an in-depth analysis of every ground under which the Plaintiffs assert the Court has jurisdiction.[2]

[¶6]     The Plaintiffs have brought an ICRA claim in the MHA Tribal Court. The Plaintiffs recognize their ICRA claims are properly brought before the Tribal Court. However, they assert that because this Court has purported jurisdiction over their federal statutorily based VRA claims, they should be relieved of their exhaustion requirements for their ICRA claims and this Court should hear all claims. Doc. No. 1, ¶13. In line with this request, they argue this Court should excuse exhaustion on the basis that they believe the MHA Tribal Court is not an adequate judicial forum to hear their claims. Doc. No. 1, ¶14. This Court declines the invitation to excuse exhaustion.

[¶7]     Courts have consistently stated "[t]he tribal exhaustion doctrine . . . favors exhaustion of available remedies in tribal court before a collateral or parallel federal court action may

---

[2] The Defendants also assert the Plaintiffs' other attempts to establish jurisdiction are insufficient. The Fort Berthold Allotment Agreement of 1886 and the 1937 Corporate Charter of the Tribe have no inherent grounds for jurisdiction in federal court. The Declaratory Judgment Act and Federal Rule of Civil Procedure 65 are procedural and not jurisdictional. The Indian Reorganization Act does not give rise to a private cause of action or private remedy.  See Baker v. Scarlett, No. 4:06-cv-039, 2006 U.S. Dist. LEXIS 74492, at *11 (D.N.D. Oct. 4, 2006).

proceed." Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians, 317 F.3d 840, 849 (8th Cir. 2003). The Supreme Court requires a party to exhaust Tribal Court remedies even in cases where a federal court has jurisdiction concurrent with a Tribal Court and even where non-Indian parties are involved." World Fuel Servs., Inc. v. Nambe Pueblo Dev. Corp., 362 F. Supp. 3d 1021, 1058 (D.N.M. 2019). "Exhaustion is required as a matter of comity, not as a jurisdictional prerequisite," so "the rule is analogous to principles of abstention[.]" Stanko v. Oglala Sioux Tribe, 916 F.3d 694, 699 (8th Cir. 2019) (citing Iowa Mut., 480 U.S. at 16 n.8, 107 S.Ct. 971). "Where applicable, this prudential doctrine has force whether or not an action actually is pending in a tribal court." Hengle v. Asner, 433 F. Supp. 3d 825, 860 (E.D. Va. 2020), motion to certify appeal granted, No. 3:19CV250 (DJN), 2020 WL 855970 (E.D. Va. Feb. 20, 2020). "Moreover, the doctrine applies even though the contested claims are to be defined substantively by state or federal law." Id. But even where a federal question exists, due to considerations of comity, federal court jurisdiction does not properly arise until available remedies in the tribal court system have been exhausted." Auto-Owners Ins. Co. v. Tribal Court of Spirit Lake Indian Reservation, 495 F.3d 1017, 1021 (8th Cir. 2007).

[¶8]      This is to ensure certain interests of both tribal and federal courts are advanced including: "(1) supporting tribal self-government and self-determination; (2) promoting the orderly administration of justice in the federal court by allowing a full record to be developed in the Tribal Court; and, (3) providing other courts with the benefit of the tribal courts' expertise in their own jurisdiction." Hengle v. Asner, 433 F. Supp. 3d 825, 860 (E.D. Va. 2020), motion to certify appeal granted, No. 3:19CV250 (DJN), 2020 WL 855970 (E.D. Va. Feb. 20, 2020) (citing Nat'l Farmers Union Ins. Co. v. Crow Tribe of Indians, 471 U.S. 845, 856-57, 105 S.Ct. 2447, 85 L.Ed.2d 818

(1985)). It becomes even more important when the issues being litigated involve tribal affairs and tribal members. For example, in Navajo Nation v. Intermountain Steel Bldgs., the Court noted:

> It is difficult to conceive how tribal self-government and self-determination will be advanced by the exercise of federal court jurisdiction over a matter involving the Navajo Nation, a Navajo commercial entity, and a contract between these Navajo parties and a non-Indian defendant to construct a Navajo-owned building located on Navajo land within the boundary of the Navajo Nation. This is especially true because the parties disagree about the applicability of Navajo law and custom . . . There is no reason to believe that the courts of the Navajo Nation would not be able to properly address the parties' dispute. To support tribal self-government, the Navajo tribal courts should be given the opportunity to do so.
> Moreover, if the Navajo Tribal Court reached the merits of the action, a federal court would have the benefit of the Navajo Tribal Court's prior interpretation of Navajo law and customs that may apply to this case.

Navajo Nation v. Intermountain Steel Bldgs., Inc., 42 F. Supp. 2d 1222, 1229 (D.N.M. 1999)

[¶9]     The Supreme Court has recognized four narrow exceptions to the tribal exhaustion doctrine. These include:

> (1) the assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bath faith; (2) the tribal action is patently violative of express jurisdictional prohibitions; (3) exhaustion would be futile because of a lack of an adequate opportunity to challenge the tribe's jurisdiction, and (4) exhaustion would serve no purpose other than delay where no federal grant provides for tribal governance of nonmembers' conduct.

 Magee v. Shoshone Paiute Tribes of Duck Valley Reservation, No. 319CV00697LRHCLB, 2020 WL 2468774, at *3 (D. Nev. May 11, 2020) (citing 533 U.S. 353, 369, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001)) (citing Nevada v. Hicks). The Plaintiffs in this matter seek to invoke exception (3) futility.

[¶10]     On November 2, 2018, the Plaintiffs commenced an action in MHA Tribal District Court seeking "(1) a preliminary injunction requiring absentee ballots be sent to all tribal voters over the age of eighteen in the 2018 tribal elections and enjoining any further action on the 'return to the Reservation to vote' requirement and (2) a declaratory judgment invalidating the 'return to

the Reservation to vote' requirement." Doc. No. 1, ¶19. The Tribal District Court denied the

Plaintiffs' request on November 5, 2018. Doc. No. 1, ¶19. On March 8, 2019, the TBC moved to

dismiss the Plaintiffs' Complaint. Doc. NO. 1, ¶19. Because the TBC attached extrinsic documents

in support of its Motion to Dismiss, the Tribal Court converted the Motion into a Motion for

Summary Judgment. Doc. No. 1, ¶19. Oral argument was heard on May 30, 2019. Doc. No. 1, ¶19.

On August 5, 2019, the Tribal District Court dismissed the Plaintiffs' case. Doc. No. 1, ¶19.

[¶11]     The Plaintiffs appealed that decision to the MHA Supreme Court on October 24, 2019,

requesting an expedited oral argument. Doc. No. 1, ¶19. The Plaintiffs renewed their request for

oral argument on April 20, 2020, with considerations surrounding the COVID-19 pandemic. Doc.

No. 1, ¶19. The MHA Supreme Court heard oral argument on June 3, 2020 via Zoom video call.

Doc. No. 1, ¶19. The MHA Supreme Court issued its opinion on July 28, 2020. Doc. No. 1, ¶19.

Importantly, the MHA Supreme Court did not render a final decision. Instead, they remanded the

case to the MHA Tribal District Court for further analysis. Doc. No. 1-3, p. 10. The matter is still

pending, and the MHA Tribal Court has not yet rendered an opinion. Doc. No. 21 at ¶3.  The

Plaintiffs have brought their concerns directly with the MHA Tribal Court in this matter, and the

MHA Tribal Court has not yet addressed these concerns.[3]

---

[3] Shockingly, the MHA Tribal Court has not made a decision and we are now less than one week
before the election.  This Court presumes the lack of an answer becomes the answer, i.e., non-
resident tribal members cannot vote absentee.  The Plaintiffs here have been attempting to pursue
a remedy in the MHA Tribal Court since November of 2018.  The failure to make a decision when
the fundamental right of voting is involved raises the question of whether the MHA Tribe has a
functioning court system. American citizens who happen to be members of an Indian tribe should
not live with disfunction and denial of rights from their own tribes. The Defendants here should
be on notice, the failure to provide a functioning court system may invite intervention by the United
States Courts. See, e.g., Johnson v. Gila River Indian Community, 174 F.3d 1032, 1036 (9th Cir.
1999) (concluding a dismissal of a federal court action was not appropriate where a two-year
failure to consider an appeal of a tribal court decision by a tribal appeals court was sufficient to
conclude a functioning appellate court does not exist and exhaustion would be futile), and Krempel

[¶12]      Despite the ongoing process, the Plaintiffs "firmly believe that the tribal court – at both the trial and appellate stages of Plaintiffs' case therein – greeted their assertions of their equal protection and due process rights that are guaranteed to them by both the express terms of the TAT Constitution, as well as by the specifically applicable federal statue known as ICRA, with seeming skepticism." Doc. No. 1, ¶13. On this basis, they assert the MHA Tribal Court "demonstrably represents an inadequate judicial forum," and they should not be required to further litigate their rights there. Doc. No. 1, ¶13.

[¶13]      To the Plaintiffs, the MHA Supreme Court's statements that "it is not required to follow the same legal analysis [as would a federal court] applicable to rights afforded under the U.S. Constitution." Doc. No. 1, ¶14. However, the MHA Supreme Court is correct in this assertion. The ICRA is not a mirror of the rights afforded under the United States Constitution. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 62, 98 S. Ct. 1670, 1679, 56 L. Ed. 2d 106 (1978) ("[ICRA], rather than providing in wholesale fashion for the extension of constitutional requirements to tribal governments, as had been initially proposed, selectively incorporated and in some instances modified the safeguards of the Bill of Rights to fit the unique political, cultural, and economic needs of tribal governments."); see also United States v. Bryant, 136 S. Ct. 1954, 1962, 195 L. Ed. 2d 317 (2016), as revised (July 7, 2016) ("In ICRA, however, Congress accorded a range of procedural safeguards to tribal-court defendants similar, but not identical, to those contained in the Bill of Rights and the Fourteenth Amendment.") (quotations omitted).

[¶14]      In fact, federal courts and tribal courts routinely acknowledge the Fourteenth Amendment is not applied the same in tribal courts as it is in federal courts. See Wounded Head

---

v. Prairie Island Indian Community, 125 F.3d 621, 622 (8th Cir. 1997) (observing where there is no functioning tribal court, exhaustion would be futile).

v. Tribal Council of Oglala Sioux Tribe of Pine Ridge Reservation, 507 F.2d 1079, 1082 (8th Cir. 1975) ("The [findings that] ICRA is not coextensive with the fourteenth amendment embodies the concept that the federal courts should not, absent explicit legislation to the contrary, interfere with the internal governmental affairs of Indian tribes."); see also Tom v. Sutton, 533 F.2d 1101, 1105 (9th Cir. 1976) ("[C]ourts have been careful to construe the terms 'due process' and 'equal protection' as used in the Indian Bill of Rights with due regard for the historical, governmental and cultural values of an Indian tribe. As a result, these terms are not always given the same meaning as they have come to represent under the United States Constitution."); Jacobson v. E. Band of Cherokee Indians, No. CV 05-101, 2005 WL 6437829, at *4 (Eastern Cherokee Ct. Nov. 18, 2005), aff'd, No. CV 05-101, 2006 WL 8435928 (Eastern Cherokee Sup. Ct. Nov. 29, 2006) ("Interestingly, the equal protection provisions of the ICRA, 25 U.S.C. § 1302(8), do not completely encompass the Constitutional equal protection guaranteed in the Fourteenth Amendment, or perhaps more accurately, these provisions encompass somewhat different considerations from the Constitution. For example, Tribal custom and tradition may be brought before the Court in analysis of whether a statute comports with 25 U.S.C. § 1302(8) where it would not be relevant in a traditional Federal Constitutional analysis.").

[¶15]      Additionally, the Plaintiffs express concern with the Tribal Court's statement that it has discretion to classify Plaintiffs' voting rights as fundamental, noting the tribal court will just apply whatever standard it pleases. Doc. No. 1, ¶15. However, upon review of the MHA Supreme Court Order, the court did not make a finding that the right was <u>not</u> fundamental. Doc. No. 1-3, p. 9-10. Instead, the MHA Supreme Court noted state and federal courts treat the right as fundamental, and if it did so as well, it would follow the strict scrutiny standard. Doc. No. 1-3, p. 10. The Court then went on to state "[t]he record is insufficiently developed for us to determine whether the equal

protection guarantees of the ICRA have been violated by the absentee voting provision of the Tribal Election Ordinance or whether the TBC may have had a compelling interest in amending Title XII of the tribal code to treat residents and non-residents differently with respect to the absentee ballot provisions." Doc. No. 1-3, p. 10. The MHA District Tribal Court has not yet rendered its opinion on this issue on remand, and while it is tempting to brand the tribal court as non-functioning, there are more significant reasons why the tribe, itself, must make this decision.

> The potential participation of off-reservation citizens in tribal self-government raises a number of issues. On the one hand, participation can solidify an individual's sense of identity and strengthen her bonds to the tribe. Enfranchisement thus performs an important expressive function. On the other hand, on-reservation and off-reservation citizens may have different policy preferences. For example, in tribes now receiving substantial revenue from natural resource development or Indian gaming, on-reservation members may want those funds to be spent on infrastructure and economic development, while off-reservation members may prefer that revenues be distributed directly to tribal members on a per capita basis. At the same time, arguments of on-reservation citizens to restrict the franchise to residents because they have more of a stake run the risk of recapitulating some of the historic justifications used to disenfranchise on-reservation Indians, particularly to the extent that tribal elections determine more than geographically based policies. And there is some irony in denying tribal citizens the right to vote to the extent that a lack of opportunity in Indian country was one factor impelling them to move off the reservation.

Pamela S. Karlan, Lightning in the Hand: Indians and Voting Rights, 120 YALE L.J. 1420, 1448 (2011) (reviewing LAUGHLIN MCDONALD, AMERICAN INDIANS AND THE FIGHT FOR EQUAL VOTING RIGHTS (2010)).

[¶16]     While this Court sympathizes with the Plaintiffs' position regarding their ability as tribal members to vote and elect individuals who may have significant roles within the Tribe, the Court also recognizes this is an intra-tribal dispute. The MHA Tribal Court is currently addressing the grievances brought before it by members of its tribe concerning its tribal election. This Court will not interject itself into a purely intra-tribal matter. See Williams v. Sisseton-Wahpeton Sioux Tribal Council, 387 F. Supp. 1194, 1199 (D.S.D. 1975) ("Intervention in an intra-tribal

controversy, which is what we have in the instant case, is an action that a court should take only with some hesitation absent a Congressional mandate."). Plaintiffs are not excused from exhausting their tribal remedies.[4]

### b. Lack of Subject Matter Jurisdiction Over VRA claims

[¶17]    In addition, the Court finds it does not have subject matter jurisdiction over the Plaintiffs' VRA claims. Pursuant to Federal Rule of Civil Procedure 12(h)(3), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). "It is well established that a court has a special obligation to consider whether it has subject matter jurisdiction in every case." Hart v. United States, 630 F.3d 1085, 1089 (8th Cir. 2011). "This obligation includes the concomitant responsibility 'to consider sua sponte [the court's subject matter] jurisdiction ... where ... [the court] believe[s] that jurisdiction may be lacking.'" Id. (quoting Clark v. Baka, 593 F.3d 712 (8th Cir. 2010)).

---

[4] However, "the only federal relief available under the Indian Civil Rights Act against a tribe or its officers is a writ of habeas corpus." Wheeler v. Swimmer, 835 F.2d 259, 261 (10th Cir. 1987). In Wheeler, a case involving tribal elections, the Court noted:

> Our holding that the Cherokee Nation possesses an inherent right to self-government without federal government intrusion disposes of appellants' claims under the Indian Civil Rights Act. The district court correctly held that the Indian Civil Rights Act confers no subject matter jurisdiction in this case for declaratory, injunctive, and monetary damage remedies. The only federal relief available under the Indian Civil Rights Act against a tribe or its officers is a writ of habeas corpus. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 63 (1978). Actions for any other relief must be brought through tribal forums. The federal courts must decline jurisdiction where such forums are available. Goodface v. Grassrope, 708 F.2d 335, 338 n. 4 (8th Cir.1983). We reemphasized this principle in Wheeler saying: "Congress, in the Indian Civil Rights Act, 25 U.S.C. §§ 1301–1341 (1982), elected to impose less supervision on tribal administration of civil rights disputes than it imposes on federal and state governments. The Act's legislative history indicates that this reflects a deliberate choice by Congress to limit intrusion into traditional tribal rights." 811 F.2d at 551. The district court in this case properly declined jurisdiction on this ground.

Wheeler, 835 F.2d at 261.

[¶18]     Plaintiffs claim the Defendants have violated their voting rights under the Voting Rights Act, 52 U.S.C. § 10301. Specifically, the Plaintiffs allege the "'return to the Reservation to vote' requirement and absentee balloting ordinances result in 'vote denial' in violation of Section 2 of the VRA." Doc. No. 1, ¶56). Their second claim for relief request:

> Defendant TBC's decision installing its "segment based" representational system on the Fort Berthold Reservation has resulted in the total exclusion of Plaintiff Cross, and his fellow nonresident TAT voters, from ever holding office within the TAT, from ever nominating a candidate of his or their choice to serve on the TBC or from ever having any voice in the financial or economic decision making within the TAT, all in violation of Section 2 of the VRA's prohibition of representational standards, practices or procedures that deny an identifiable group or class of otherwise eligible voters the equal protection and due process of law.

Doc. No. 1, ¶64.

[¶19]     The Plaintiffs ultimately seek declaratory relief pursuant to § 2 of the VRA, specifically requesting this Court to decree that the TBC's conduct has resulted in vote denial and vote dilution. Doc. No. 1. They seek injunctive relief in the form of this Court appointing a Special Master pursuant to Federal Rule of Civil Procedure 53 to oversee a number of voting procedures for the 2020 TAT election and aid in the development of voting procedures for the 2022 TAT election.

[¶20]     On its face, however, the VRA only applies to States and political subdivisions. See 52 U.S.C. §§ 10101(1)[5]; 30101[6]; see also Wounded Head v. Tribal Council of Oglala Sioux Tribe of

---

[5] 52 U.S.C. § 10101 states:

> All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding.

(emphasis added).

[6] 52 U.S.C. § 10301(a)-(b) states:

Pine Ridge Reservation, 507 F.2d 1079, 1081 (8th Cir. 1975) ("It has also been stated unequivocally that Indian tribes are not to be equated with states."). Courts have also explicitly stated the VRA does not apply to tribal elections. See 40 A.L.R. Fed. 2d 1 (citing Cruz v. Ysleta Del Sur Tribal Council, 842 F. Supp. 934, 5 A.D.D. 336 (W.D. Tex. 1993) ("The Voting Rights Act by its own terms applies to any election in any state, territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision. Nothing in the Act indicates that Congress intended it to apply to Indian tribal elections, and the Court finds it is not so applicable.")); Wounded Head v. Tribal Council of Oglala Sioux Tribe of Pine Ridge Reservation, 507 F.2d 1079, 1084 (8th Cir. 1975) ("[I]ndian tribes are not states or political subdivisions, and the legislative history of the Voting Rights Act is silent as to whether the Act was intended to affect the voting age of Indians in tribal elections. Plaintiffs' argument that Indians are included in the statute is based on the expanding concepts of due process and equal protection rather than

---

**(a)** No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any **State or political subdivision** in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

**(b)** A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

(emphasis added).

specific language within the Act. Although ingenious, it is not persuasive."); Gardner v. Ute Tribal Court Chief Judge, 36 F. App'x 927, 929 (10th Cir. 2002) ("Finally, section 2 of the Voting Rights Act, by its terms, does not apply. See 42 U.S.C.1973(a) (limiting provisions of statute to States and their political subdivisions."); see also 1977 S.D. Op. Att'y Gen. 175 (1977) ("Indian tribal elections are not covered by the Voting Rights Act.").

[¶21]     The Plaintiffs have failed to meet their burden to establish this Court's subject matter jurisdiction over this action.  This Court lacks subject matter jurisdiction over the Plaintiffs' VRA claims, as the crux of their grievances relate to their ability to vote in a tribal election.[7] They do not contend the State or a political subdivision has interfered with their ability to vote in a "State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision" election. 52 U.S.C. § 10101. The VRA has not been extended to tribal elections, and Congress appears to remain silent on the issue. The Court therefore recognizes, "[i]ndian tribes remain separate sovereigns that pre-existed the Constitution, and 'courts will not lightly assume that Congress in fact intends to undermine Indian self-government.'" Spurr v. Pope, 936 F.3d 478, 483 (6th Cir. 2019), cert. denied, 140 S. Ct. 850, 205 L. Ed. 2d 465 (2020) (citing Bay Mills, 572 U.S. at 790, 134 S.Ct. 2024).

## CONCLUSION

[¶22]     Voting is a fundamental right.[8] The frustrations experienced by the Plaintiffs in this matter relate to their desire to participate in the election of members to their tribe's governing

---

[7] Even if the Court had exercised jurisdiction over the VRA claim, the Court would have denied the Plaintiff's motion for a preliminary injunction at this stage because the Dataphase factors do not weigh in favor of the issuance of such an order.  See Dataphase Systems, Inc., v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981).

[8] See McDonald v. Bd. of Election Comm'rs of Chicago, 394 U.S. 802, 807 (1969) (finding voting is a fundamental right, but voting absentee is not); see also Prigmore v. Renfro, 356 F.Supp. 427, 432 (N.D.Al. 1972) (same).

body. "Given the quasi-sovereign status of the Indian tribes, [tribes] should be permitted to determine the extent to which the franchise to vote is to be exercised in tribal elections, absent explicit Congressional legislation to the contrary." Wounded Head v. Tribal Council of Oglala Sioux Tribe of Pine Ridge Reservation, 507 F.2d 1079, 1083 (8th Cir. 1975).

[¶23]     For the reasons explained above, Defendant's Motion to Dismiss is **GRANTED** and the Plaintiff's Complaint is **DISMISSED without prejudice**. The Plaintiff's Motion for Declaratory Judgment and Injunctive Relief, Motion Requesting Oral Argument, and Motion for a Preliminary Injunction are **DENIED AS MOOT**.

[¶24]     **IT IS SO ORDERED.**

        DATED October 28, 2020.

Daniel M. Traynor, District Judge
United States District Court